STATE OF NEBRASKA EX REL. JERRY J. TOMKA, APPELLEE, V. THEODORE J. "TED" JANING, APPELLANT.

158 N. W. 2d 213

Filed April 12, 1968. No. 36794.

Viren, Emmert & Epstein, for appellant.

McGowan & Troia, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

NEWTON, J.

This is an action in the nature of quo warranto brought by relator Jerry J. Tomka to test the right of respondent Theodore J. "Ted" Janing to hold or retain the office of sheriff of Douglas County, Nebraska. Respondent opposed the then incumbent of the office, Patrick E. Corrigan, in the general election held on November 8, 1966, received a majority of the votes cast for such office, was certified to be the duly elected sheriff of the county, qualified therefor, and has been the acting sheriff since

the commencement of the term for which he was elected. The trial court found for the relator; declared the election of respondent void and the office of sheriff vacant; and ordered that respondent be ousted and excluded from the office of sheriff. Respondent has appealed.

Relator contends that in the 1966 election campaign, respondent violated section 32-1101, R. R. S. 1943, in that he offered to pay, contribute, or expend money, or thing of value as compensation for votes with the intention to promote his election. Specifically, complaint is made regarding the content of certain public addresses made by respondent, handbills circulated, and an open letter printed in the Omaha World-Herald.

Respondent openly condemned certain practices of his opponent, sheriff Corrigan, connected with the operation of the sheriff's office. The sheriff operated a "jail concession" or "candy store operation." Such things as confections, playing cards, toothpaste, etc., were stocked at the sheriff's expense and sold to jail inmates. The concession was operated on county property, by county employees working in the sheriff's office. All profits were retained by the sheriff. Of the 10 cents per mile lawfully allowed deputy sheriffs as "mileage," sheriff Corrigan retained, or required his deputies to pay over to him, 3 cents. A fund, designated as a "flower fund" was maintained to which all employees of the sheriff's office contributed. Law enforcement officers were assessed $5 per month and civilian employees, $3 per month. This appears to have been regarded as a campaign fund. In a television appearance, respondent referred to a card which set out the mileage and mileage fees attributed to the sheriff's office, the estimated income from the jail concession, and the estimated amount collected for the "flower fund" over the 12-year period of sheriff Corrigan's incumbency.

Remarks attributed to respondent or found in his campaign literature and newspaper items consist of the following:

"Save taxpayers money by returning all profits the Sheriff now keeps to the general fund."

"Work for legislation that will abolish the 'gravy train' in the Sheriff's office."

"Another area in which Mr. Janing has pledged change is that of the additional income the Sheriff receives from jail concessions and mileage fees. * * * He's said that he will 'work for legislation that will prevent this continuing in the future. And, until such legislation passes there will be a full and true accounting, and the County, not the Sheriff, will receive all the gains.' "

References to "flower fund" and jail concession were followed by: "Do you agree with your opponent, Theodore 'Ted' Janing, and his avowed promise to the voters of Douglas County, that not one cent of these gains and profits will be retained by him? * * *

"Your opponent has given his avowed promise that all extra funds will be deposited in the Douglas County treasury and used solely for its needs."

" 'I pledge myself to return all extra and hidden income to the County Treasury, * * * I will work for my salary alone.' "

" '* * * large, shocking profits and special gains were pocketed by our Sheriff, * * *.' "

"* * * 'flower fund' has added more than 50 thousand dollars to his income and has been used 'mostly for election campaigns.' Each Sheriff's office employe (sic) must contribute * * *."

It is estimated that the sheriff had "a 'secret income' of 10 to 15 thousand dollars above his * * * annual salary."

The foregoing excerpts of statements attributable to respondent were intended to and did indicate that the three means adopted by sheriff Corrigan to secure additional income were improper and should be halted.

Regarding mileage, it was stipulated by the parties that where mileage was incurred in connection with the duties of the deputy sheriffs, they, in all instances, made

use of their own automobiles. Section 23-1112, R. R. S. 1943, provides that: "When it is necessary for any county officer or his deputy or assistants, except any county sheriff or his deputy, to travel on business of the county, he shall be allowed mileage * * *." Section 33-117, R. S. Supp., 1965, provides: "(1) The several sheriffs shall charge and collect * * * traveling expenses for each mile actually and necessarily traveled within or without their several counties in their official duties, ten cents; * * *." Deputies, excepting only in matters involving discretion, are vested with the same authority as the sheriff. See, 80 C. J. S., Sheriffs and Constables, § 37, p. 206; 47 Am. Jur., Sheriffs, Police, and Constables, § 154, p. 929. The foregoing statute providing for mileage allowance for a sheriff does not mention deputies, but in view of the general authority vested in such deputies, it is apparent that a deputy has the same lawful authority to collect the mileage provided by law where the deputy has himself performed the travel involved in connection with his official duties and made use of his own automobile as does the sheriff. The mileage fees earned by the deputy traveling in his own conveyance are the property of the deputy and not of the sheriff. The sheriff could not retain these fees as a matter of right. He did so either by virtue of voluntary contributions on the part of the deputies or by unlawful assessments levied against them. Insofar as such mileage fees of the deputies are concerned, not being the property of the sheriff, they cannot lawfully be disposed of by him or returned to the county and, indeed, many of these fees being incurred in civil actions and paid by private individuals were never derived from the county in the first instance. Having been received from the deputies, not the county, they were not subject to a *return* to the county. In regard to these fees, it is evident that respondent could not, if elected sheriff, give away something that was not his to give and as hereinafter mentioned, his statements are not subject to such interpretation.

Regarding the "flower fund," no portion of this fund was derived from the county either directly or indirectly and, consequently, could not be *returned* to the county. One can "give back," "turn back," or "return" something only by a redelivery to the party from whom it was received. Respondent's statements that he would return "all profits," "all extra and hidden income," or "extra funds" in the absence of a strained, unusual, and inaccurate interpretation of the word "return," can scarcely be interpreted to mean that respondent was planning to give these funds to the county.

The mileage assessments and contributions to the "flower fund" represent activities which are forbidden under the federal Hatch Act and by statute in many of the states, but in Nebraska that may or may not be unlawful. If they represent voluntary donations by employees, they are not subject to criticism, but if they represent sums extorted from employees as a prerequisite to holding their jobs, it would be deemed unlawful as such acts are contrary to public policy. The evidence is not conclusive on this point. In any event, these were private funds of the individuals concerned as distinguished from public funds and the county had no interest in or claim to them.

To interpret the statements of respondent in regard to mileage fees and the "flower fund" as evidencing an intent to return such funds to the county treasury can only be arrived at if respondent's statements that he would " 'work for legislation that will prevent this continuing in the future' " and to "abolish the 'gravy train' " are completely ignored. These statements connote, and their plain meaning evidences, an intention on his part not only to seek legislation to render such activities illegal in the future, but also to abolish such funds and not to continue them for the benefit of the county, the taxpayer, or anyone else. Considering respondent's statements as a whole, rather than taking certain phrases out of context, makes it clear that it was his intention to

put a stop to these practices and to do away completely with the mileage and "flower fund" collections.

The "jail concession" or "candy store," and the profits derived from its operation, present a different picture. This was an operation which represented a definite accommodation to the inmates of the county jail and a convenience to the sheriff and his employees in that it provided a simple and time-saving method of supplying the wants or needs of the inmates for many articles. This proposition clearly deals with a "profit" in the common, ordinary, and accepted meaning of the word. It is obvious that respondent felt that such profits did or should belong to the county and his statements regarding a return of profits and extra funds or income, were applicable. He promised the voters that he would turn over such income to the county and "work for my salary alone."

Whether or not such promise represents a violation of section 32-1101, R. R. S. 1943, necessarily depends on whether he was promising to return to the county treasurer something to which the county was not entitled. If these funds belonged to the county, he was simply agreeing to perform his legal duty and was not promising the taxpayers anything to which they were not already entitled. On the other hand, if these were not county funds, he was clearly in violation of the statute.

Could the concession profits be legally retained by the sheriff or was he required to account for them to the county? The inventory or merchandise was purchased with the sheriff's personal funds. The business was operated on county property in space for which the county provided all the utilities such as heat, light, janitor service, etc. It was operated by persons employed and paid by the county. It was intended to serve the inmates of the county jail who were under the direct charge of the sheriff and it was so directly connected with the sheriff's office that no one else could have operated it without the cooperation and consent of the sheriff. It

was a service rendered in the performance of his duties. It was as much the duty of the sheriff to provide the other necessaries of life as it was to feed the inmates and as a practical matter, it was his privilege to make other items available, at the inmates' expense, when deemed advisable.

The general rules applicable to this situation may be found in 67 C. J. S., Officers, § 88, p. 325: "Where the duties of an officer are increased by the addition of other duties germane to the office without provision for compensation, the officer must perform such duties without extra compensation. So, an officer is not entitled to extra compensation because additional duties pertaining to the office have been assumed by him or imposed on him by the exigencies of the office. Services required of officers by law for which they are not specifically paid must be considered compensated by the fees allowed for other services.

"On the other hand, an officer is not obliged, because his office is salaried, to perform all manner of public service without additional compensation, and for services performed by request, not part of the duties of his office, and which could have been as appropriately performed by any other person, he may recover a proper remuneration. In this connection, although service not required by the law cannot be classed as official duties, nevertheless public policy requires that courts should not favor nice distinctions in order to declare certain acts of public officers extraofficial."

In Ehlers v. Gallagher, 147 Neb. 97, 22 N. W. 2d 396, this court said: "It is well settled in this state that an officer can charge only such fees for the performance of services as are allowed by law, and that services performed by an officer for which the statute does not expressly authorize a charge must be performed gratuitously." In Johnson v. Johnson, 141 Neb. 239, 3 N. W. 2d 414, it was stated that: "In Nebraska a public officer must perform all the duties of his office for the com-

pensation allowed by law and if none is authorized the services are gratuitous." In Neisius v. Henry, 142 Neb. 29, 5 N. W. 2d 291, affirmed in 143 Neb. 273, 9 N. W. 2d 163, the court held: "Even in the absence of statute, public policy and sound morals forbid a public officer from receiving compensation other than the salary prescribed by law. When additional pay or perquisities are accepted by a public officer for performance of duties germane to his office, a taxpayer has a right to insist that the funds wrongfully received shall be returned to the public treasury."

The service rendered does not appear to have been performed "by request." The operation of the concession was not a duty imposed by law on the sheriff, but making provision for the reasonable or necessary wants of the inmates of the jail is an official duty of the sheriff and the operation of the concession was simply a convenient means of performing such duty and of supplying other desired but harmless articles. We must necessarily conclude that the sheriff is not entitled to any income, other than the salary and fees provided by law, for the performance of duties directly connected with the operation of his office, required by the inherent nature of his office, and with which he is charged under the law. The concession profits were the property of the county for which it was entitled to an accounting. This being true, there was no violation in regard to the promise to account to the county for such funds.

This is an unusual case and differs materially from the ordinary action brought under the Corrupt Practices Act. Ordinarily offers of money or property made to the electorate are simple and direct, having but one clear purpose, namely the election of the offeror. It is contended that this is true in the present instance, but obviously this is not correct. Respondent was no doubt interested in his own election, but what was his purpose in pointing out the acts of his opponent, the then incumbent of the office, which respondent deemed to be corrupt

and unlawful? Was he seeking to bribe the electorate or was he seeking to convince the electorate of the corruptness of his opponent? If the first, he was acting unlawfully. If the second, he was not only acting lawfully, but in the best interest of the public and in accord with morality and good conscience. Common sense and practicality would indicate that it was the second course he was seeking to pursue. It is common knowledge that the electorate almost invariably denounces corruption and, if convinced of its existence, respondent's election was assured.

As heretofore pointed out, many jurisdictions have denominated the type of practices criticized by respondent as corrupt and unlawful. Even in the absence of statute, sound morals forbid encouraging them, and by the same token, public policy requires that a candidate for office who condemns these practices, in the absence of clear and convincing evidence to the contrary, should not have his statements so narrowly interpreted as to require a finding that he is advocating a continuance of such practices.

The judgment of the trial court is reversed and the cause is dismissed.

REVERSED AND DISMISSED.