STATE of North Dakota, ex rel., Robert PETERSON, in His Capacity as State Auditor of the State of North Dakota, and John S. Lesmeister, in his Capacity as State Treasurer of the State of North Dakota, Relators and Petitioners,

v.

Allen I. OLSON, in his Capacity as Governor of the State of North Dakota, and Dale Moug, in his Capacity as Director of the Accounts and Purchases Department, Respondents.

Civ. No. 9999.

Supreme Court of North Dakota.

June 25, 1981.

Robert O. Wefald, Atty. Gen., argued by Terry L. Adkins, Asst. Atty. Gen., Bismarck, for relators and petitioners.

Wheeler, Wolf, Peterson & McDonald, Bismarck, for respondents; argued by Albert A. Wolf, Bismarck.

PAULSON, Justice.

The Forty-seventh Legislative Assembly of the State of North Dakota enacted House Bill No. 1648, which provided for an appropriation of $87,000 to the Governor's office in order to defray expenses incurred by the Lieutenant Governor in the performance of additional duties prescribed by the Governor for the biennium beginning July 1, 1981, and ending June 30, 1983. The Legislature declared that House Bill No. 1648 was an emergency measure, to have full force and effect from and after its passage and approval by the Governor on April 1, 1981.

Following the approval of the bill, Governor Allen I. Olson assigned additional duties to Lieutenant Governor Ernest M. Sands on or about April 1, 1981. The duties include assisting in intergovernmental affairs; acting as a liaison between state, county, and city governments; assisting in ceremonial functions; and assisting in economic development programs. On April 24, 1981, the Governor filed an amended employee master record with the Department of Accounts and Purchases in order to increase the Lieutenant Governor's monthly salary by using funds appropriated to the Governor's office by House Bill No. 1648.

On April 30, 1981, Dale Moug, the Director of the Department of Accounts and Purchases, prepared a warrant check drawn upon the funds appropriated to the Governor's office under House Bill No. 1648 and presented the warrant check to Robert Peterson, the State Auditor, and John Lesmeister, the State Treasurer, for their approval and signatures pursuant to § 54–27–08 of the North Dakota Century Code. Both the State Auditor and the State Treasurer refused to approve and sign the warrant check prepared by the Director of the Department of Accounts and Purchases and refused to deliver the warrant check to the payee, the Lieutenant Governor.

On May 1, 1981, the State Auditor and the State Treasurer filed with this court an application for a writ of mandamus to prohibit the Director of the Department of Accounts and Purchases from preparing warrant checks drawn upon the State Treasurer and from utilizing funds appropriated to the Governor's office by House Bill No. 1648 for the purpose of paying the Lieutenant Governor for the expenses he incurs (which apparently includes salary) in performing the additional duties assigned to him by the Governor. In addition, an application for an alternative writ of mandamus was filed with this court which seeks to restrain the Governor from prescribing additional duties to the Lieutenant Governor and to restrain the Director of the Department of Accounts and Purchases from preparing warrant checks utilizing funds appropriated to the Governor's office under House Bill No. 1648 for payment to the Lieutenant Governor. Both the Governor and the Director of the Department of Accounts and Purchases filed returns and amended returns to the application for an alternative writ of mandamus and stated reasons why they should not be restrained in the manner requested in the alternative writ of mandamus.

All of the parties involved in this action urge this court to accept original jurisdiction over this matter, pursuant to Article VI, § 2 of the North Dakota Constitution, because the questions presented are *publici juris* in that the sovereignty of the State, the franchises or prerogatives of the State, or the liberties of its people are affected. The questions presented by the parties are as follows:

1. Whether or not Article V, § 7 of the North Dakota Constitution impliedly limits the authority of the Governor to prescribe additional duties to the Lieutenant Governor where those duties materially change the functions which the Lieutenant Governor may perform.

2. Whether or not the funds provided for in House Bill No. 1648, when paid to the Lieutenant Governor, conflict with the provisions of § 54–08–03, N.D.C.C., which prescribes an annual salary for the Lieutenant Governor.

3. Whether or not the implementation of House Bill No. 1648 during the

Lieutenant Governor's term of office violates Article V, § 14 of the North Dakota Constitution.

4. Whether or not House Bill No. 1648 became effective on April 1, 1981, as an emergency measure; or will become effective on July 1, 1981.

5. Whether or not the Legislature of the State of North Dakota has the authority to appropriate money to one constitutionally mandated office for the benefit of another constitutionally mandated office.

■ Our authority to exercise original jurisdiction is based upon Article VI, § 2 of the North Dakota Constitution. This authority is discretionary and cannot be invoked as a matter of right. The Supreme Court will determine for itself, on an *ad hoc* basis, whether or not a particular case is within its original jurisdiction. *State ex rel. Link v. Olson*, 286 N.W.2d 262 (N.D. 1979); *State ex rel. Vogel v. Garaas*, 261 N.W.2d 914 (N.D.1978). The interests of the State must not be merely incidental but must be of primary importance, and the public must have an interest or right which may be affected. *Gasser v. Dorgan*, 261 N.W.2d 386 (N.D.1977); *State v. Omdahl*, 138 N.W.2d 439 (N.D.1965).

■ The instant case involves matters which are *publici juris*, i. e., the sovereignty of the State, the franchises or prerogatives of the State, or the liberties of its people are affected. The State Auditor and the State Treasurer pose serious challenges to the authority of the Governor to prescribe additional duties to the Lieutenant Governor, as well as to the authority of the Legislature to appropriate funds to pay the Lieutenant Governor for the additional duties he performs. Because these challenges relate to the very foundation upon which the executive and legislative branches of government rest, i. e., the executive power of the Governor to prescribe duties to the Lieutenant Governor under Article V, § 7 of the North Dakota Constitution; and the authority of the Legislature to pass all laws necessary to carry into effect the provisions of the North Dakota Constitution

under Article IV, § 42, we will exercise our original jurisdiction over the matter.

Having concluded that the instant case is an appropriate one for the exercise of our original jurisdiction, we must next determine whether or not a writ of mandamus is a proper instrument for determination of the vital public issues present in this case. Chapter 32–34, N.D.C.C., provides the statutory authority for alternative and peremptory writs of mandamus. Section 32–34–01, N.D.C.C. provides:

"*32–34–01. By and to whom writ of mandamus issued.*—The writ of mandamus may be issued by the supreme and district courts to any inferior tribunal, corporation, board, or person to compel the performance of an act which the law specially enjoins as a duty resulting from an office, trust, or station, or to compel the admission of a party to the use and enjoyment of a right or office to which he is entitled and from which he is precluded unlawfully by such inferior tribunal, corporation, board, or person."

■ The State Auditor and the State Treasurer request that this court compel the Governor and the Director of the Department of Accounts and Purchases to perform only those duties required by their respective offices and to refrain from acting outside their authority. In these circumstances, an injunction, rather than a writ of mandamus, is the appropriate remedy. A writ of mandamus is inappropriate because it is issued to compel performance of a ministerial duty by an officer and does not issue to compel action that is discretionary in nature. Secondly, a writ of mandamus seeks to compel the performance of an act which the law regards as a duty. Here, the State Auditor and the State Treasurer seek to restrain the Governor and the Director of the Department of Accounts and Purchases from assigning additional duties to the Lieutenant Governor and then authorizing payment for the duties from a fund authorized by the Legislature for such purposes.

Despite the fact that a writ of mandamus is unavailable, the application for a writ of mandamus requested that this court issue such other relief as may be appropriate. This court, in the exercise of its original jurisdiction, may frame its process as the exigencies require. *State ex rel. Loftus v. Langer*, 46 N.D. 462, 177 N.W. 408 (1919). A writ of injunction is the correlative of the writ of mandamus. The former issues to restrain action while the latter issues to compel action. *State ex rel. McArthur v. McLean*, 35 N.D. 203, 159 N.W. 847 (1916). We will issue a writ of injunction if the resolution of the issues in the instant case necessitates such a result.

I

The first question is concerned with whether or not Article V, § 7 of the North Dakota Constitution impliedly limits the authority of the Governor to prescribe additional duties to the Lieutenant Governor. Article V, § 7 of the North Dakota Constitution provides, in pertinent part:

> "*Section 7.* The powers and duties of the lieutenant governor shall be to serve as president of the senate, and he may, when the senate is equally divided, vote on procedural matters, and on substantive matters if his vote would be decisive. Additional duties shall be prescribed by the governor...."

The basis of the State Auditor's and State Treasurer's argument is that the additional duties which the Governor has delegated to the Lieutenant Governor have changed the nature of the office from a part-time position to a full-time position. We established in *State ex rel. Sanstead v. Freed*, 251 N.W.2d 898 (N.D.1977), that the Lieutenant Governor is a member of the executive branch of government who was assigned the duty of presiding over the Senate.[1] In *State ex rel. Link v. Olson*, 286 N.W.2d 262 (N.D.1979), the court held that the Legislature is not authorized to assign duties to the Lieutenant Governor. However, the instant case involves the extent of the Governor's authority to delegate duties to the Lieutenant Governor, which is a situation different from that in *State ex rel. Link v. Olson, supra*, because the separation-of-powers doctrine is not at issue here.

This court has not had the opportunity to determine the extent of the Governor's authority to delegate additional duties to the Lieutenant Governor under Article V, § 7 of the North Dakota Constitution. The state government is composed of three separate but equal branches. While the separation-of-powers doctrine operates to confine the authority of the Legislature to impose duties upon the Lieutenant Governor, here Article V, § 7 of the North Dakota Constitution grants to the Governor the authority to delegate duties and the general terms by which the authority is granted to the Governor attests to the broad reach of the authority granted. The duties which the Governor may delegate to the Lieutenant Governor may well be such as to convert the position to a full-time one.

1. Article V, § 7 of the North Dakota Constitution [formerly Article III, § 77, Const. 1889], provides that the Lieutenant Governor may vote on procedural and substantive matters when the Senate is equally divided. At the time of our decision in *State ex rel. Sanstead v. Freed*, 251 N.W.2d 898 (N.D.1977), Article III, § 77, Const. 1889, then provided that the Lieutenant Governor "shall have no vote unless they [the Senate] be equally divided ...." In *Sanstead*, we held that the Lieutenant Governor did not have the authority to cast a tie-breaking vote on the final consideration of a bill, but we also stated, *Sanstead, supra*, 251 N.W.2d at 907–908:

"There is no language in the North Dakota Constitution which suggests that any other member of the executive branch of government, except the Governor, has any substantive authority over bills—as to whether or not they should become law. In the absence of such specific language, similar to that found in § 79 relating to the Governor, we cannot conclude that the framers of the North Dakota Constitution intended to give another member of the executive branch of government, in addition to the Governor, authority over legislative functions as to whether or not any bill should or should not become law."

The provisions of Article V, § 7 changes the result in *State ex rel. Sanstead v. Freed, supra*, because the Lieutenant Governor is now granted authority to vote on substantive matters.

Apart from those duties explicitly reserved to the Governor under the Constitution, the Governor has the authority to delegate duties to the Lieutenant Governor. As the United States Supreme Court stated in *McElrath v. United States*, 102 U.S. 426, 436, 26 L.Ed. 189, 191 (1880):

"... as to the vast multiplicity of matters involved in the administration of the executive business of the Government, it is physically impossible for the President to give them his personal supervision. Of necessity, he must, as to such matters, discharge his duty through the instrumentality or by the agency of others."

Because the duties which the Governor delegated to the Lieutenant Governor were not duties expressly reserved to the Governor, the Governor did not violate the provisions of Article V, § 7 when he delegated additional duties to the Lieutenant Governor.

## II

■ The next question concerns the effect of the payment of the funds provided for in House Bill No. 1648 to the Lieutenant Governor. Section 54–08–03, N.D.C.C., provides:

"*54–08–03. Salary of lieutenant governor.* The lieutenant governor shall receive an annual salary of eight thousand dollars *for all services* performed by him." [Emphasis added.]

House Bill No. 1648 is a general statute designed to defray "expenses" incurred by the Lieutenant Governor as a result of the additional duties assigned by the Governor. House Bill No. 1648 states [with heading of the bill and signatures omitted]:

"AN ACT making an appropriation for defraying the expense of additional duties of lieutenant governor prescribed by the governor; providing an exemption; stating legislative intent; and declaring an emergency.

"BE IT ENACTED BY THE LEGISLATIVE ASSEMBLY OF THE STATE OF NORTH DAKOTA:

"SECTION 1. APPROPRIATION. There is hereby appropriated out of any moneys in the general fund in the state treasury, not otherwise appropriated, the sum of $87,000, or so much thereof as may be necessary, to the governor's office for the purpose of defraying the expenses of additional duties of the lieutenant governor prescribed by the governor for the biennium beginning July 1, 1981, and ending June 30, 1983.

"SECTION 2. EXEMPTION. The funds herein appropriated for section 1 of this Act shall not be subject to the provisions of sections 54–27–10 and 54–27–11 of the North Dakota Century Code, relating to the time during which appropriations become available.

"SECTION 3. LEGISLATIVE INTENT. It is the intent of the legislative assembly to defray the expenses of the lieutenant governor for additional duties as may be prescribed by the governor. The legislative assembly finds the appropriation made in section 1 of this Act to be reasonable for expenses of performing the full-time duties assigned to the lieutenant governor by the governor.

"SECTION 4. EMERGENCY. This Act is hereby declared to be an emergency measure and shall be in full force and effect from and after its passage and approval."

The Governor and the Director of the Department of Accounts and Purchases assert that § 54–08–03, N.D.C.C., provides compensation for the specifically designated duties of the Lieutenant Governor, such as the duty of presiding over the Senate under Article V, § 7 of the North Dakota Constitution. The appropriation in House Bill No. 1648 provides funds for reimbursement of expenses incurred in performing the additional duties prescribed by the Governor in addition to the duty of presiding over the Senate and includes salary for services rendered in the performance of the additional duties assigned to him by the Governor. Accordingly, a distinction is drawn between the expenses incurred in the performance of duties assigned by the Governor and the salary received under § 54–08–03, N.D.C.C. If a conflict between the statutes does ex-

ist, the Governor and the Director of the Department of Accounts and Purchases argue that the later statute prevails over the earlier statute and, thus, House Bill No. 1648 would govern here.

The State Auditor and the State Treasurer argue that § 54–08–03, N.D.C.C., is a specific statute which provides for an "annual salary" for the Lieutenant Governor "for all services performed by him". They rely upon a rule of statutory construction (that the specific statute prevails over the general statute) in supporting their argument that § 54–08–03, N.D.C.C., should control. .§ 1–02–07, N.D.C.C. A crucial feature of their argument is the assumption that House Bill No. 1648 constitutes an additional salary which the Lieutenant Governor will receive for the performance of the duties which the Governor delegates to the Lieutenant Governor.

Notwithstanding the fact that all of the parties argue that House Bill No. 1648 provides for either reimbursement of expenses or a salary, we believe that House Bill No. 1648 provides compensation for both the expenses which the Lieutenant Governor incurs in the performance of additional duties as well as an increase in the salary which he receives for the performance of those duties. As such, a conflict does exist between § 54–08–03, N.D.C.C., and House Bill No. 1648 insofar as the Lieutenant Governor receives compensation in an amount in excess of the expenses which he actually incurs in the performance of the additional duties. However, this conflict is not irreconcilable because the Lieutenant Governor

is now responsible for performing duties which are not germane to his office.

Although § 54–08–03, N.D.C.C., provides for an "annual salary . . . for all services performed by him [the Lieutenant Governor]", this must be read in the light of Article V, § 7 which allows the Governor to change the office of Lieutenant Governor from a part-time position to a full-time position. It would be unconscionable to expect a person elected to a part-time position to assume a full-time position without the authorization of an increase in compensation. We construe § 54–08–03, N.D.C.C., to limit the Lieutenant Governor in the compensation he receives in performing his basic duty as presiding officer of the Senate.[2]

### III

The next question concerns whether or not the implementation of House Bill No. 1648 during the Lieutenant Governor's term of office violates Article V, § 14 of the North Dakota Constitution, which provides:

"Section 14. Salaries of public officers shall be as prescribed by law, but the salaries of any of the said officers shall not be increased or diminished during the period for which they shall have been elected, and all fees and profits arising from any of the said offices shall be covered into the state treasury."

The Governor and the Director of the Department of Accounts and Purchases contend that Article V, § 14 must be interpreted to apply to public officers whose duties remain substantially the same during

---

**2.** Although the issues are not before us, we note that there may be instances where the Lieutenant Governor may not receive both the salary provided for by § 54–08–03, N.D.C.C., and the funds provided by House Bill No. 1648. One such instance may arise when the Lieutenant Governor presides over the Senate; then the Lieutenant Governor may not act in a dual capacity—while presiding over the Senate and also performing the duties assigned to him by the Governor. A separate and distinct issue, which also is not now before us, may also arise in the event that the Governor would be unable to fulfill the duties of the office of Governor for any of the reasons specified in Art. V, § 2 of the North Dakota Constitution and the Lieutenant

Governor would perform the duties of Governor; in such a case the Lieutenant Governor would act as Governor and the question may arise as to his compensation for acting as Governor.

The parties do not contend and we do not believe that the situation in the instant case is similar to that in *Walker v. Omdahl*, 242 N.W.2d 649 (N.D.1976). The instant case involves an appropriation of funds which is in part both reimbursement for expenses and compensation in the nature of a salary. *Walker v. Omdahl, supra,* involved a question concerning the validity of significant increases in the unvouchered expenses which state officials were entitled to receive.

the entire term for which they are elected to office. Because the duties of the Lieutenant Governor are not germane to his office, Article V, § 14 would not apply. On the other hand, the State Auditor and the State Treasurer contend that the portion of House Bill No. 1648 which is in the nature of a compensation or salary for the additional duties which the Lieutenant Governor performs clearly violates Article V, § 14.

We quoted in *Walker v. Omdahl,* 242 N.W.2d 649, 656 (N.D.1976), from *State v. Miller,* 129 N.W.2d at 356–357 (N.D.1964), that in every case in which it is contended that a statute violates a constitutional provision, certain rules of statutory construction apply. These rules are:

"1. A law enacted by the Legislature is presumed to be constitutional, unless it is shown that it is manifestly violative of the organic law.

"2. The courts will construe statutes so as to harmonize their provisions with the Constitution if it is possible to do so, to the end that they may be sustained.

"3. Every presumption is in favor of the propriety and constitutionality of legislation, and improper motives in its enactment are never imputed to the Legislature."

The salary which the Lieutenant Governor receives is prescribed by § 54–08–03, N.D.C.C. We have already determined that House Bill No. 1648 provides, in part, an additional salary to the Lieutenant Governor for the performance of additional duties. The purpose of Article V, § 14 is to establish certainty as to the salary pertaining to the office and to remove from the Legislature the power to give gratuitous compensation to public officers in addition to that compensation established by law. The limitation on increasing the salary of

public officials serves to establish their independence. *State ex rel. Gilbert v. Board of Commissioners of Sierra County,* 29 N.M. 209, 222 P. 654 (1924); *Sincock v. Gately,* 262 F.Supp. 739 (D.C.Del.1967).

 The Lieutenant Governor assumed the duties of his office on January 1, 1981, and House Bill No. 1648 was approved by the Governor on April 1, 1981. A person who assumes the duties of a public office undertakes the obligation to perform the duties incident to the office for the compensation fixed for the office. He cannot seek additional compensation for what the law requires him to do. *Dunwoody v. United States,* 143 U.S. 578, 12 S.Ct. 465, 36 L.Ed. 269 (1892). However, if the additional duties imposed are not germane to the office of Lieutenant Governor, the Lieutenant Governor may receive additional compensation for their performance. *Breeden v. Nigh,* 441 P.2d 981 (Okl.1968). See also *United States v. King,* 147 U.S. 676, 13 S.Ct. 439, 37 L.Ed. 328 (1893); *Woodwell v. United States,* 214 U.S. 82, 29 S.Ct. 576, 53 L.Ed. 919 (1909).[3]

In this instance the Governor assigned additional duties to the Lieutenant Governor which include assisting in intergovernmental affairs, acting as a liaison between state, county, and city governments, assisting in ceremonial functions, and assisting in economic development programs. Article V, § 7 of the North Dakota Constitution does not define duties, in addition to serving as the president of the Senate, for which the Lieutenant Governor has primary responsibility. Pursuant to the North Dakota Constitution, and historically, the primary duty of the Lieutenant Governor is to preside over the Senate. Any additional duties assigned to the Lieutenant Governor, aside from the duty of presiding over the Senate, are not germane to the office of

**3.** It is generally held that, when new duties are imposed upon a public officer, which duties are not mere incidents of the office or are not germane to the office, but are beyond the scope of the office as it had previously existed or functioned, the public officer may receive additional compensation for the performance of such duties without violating a constitutional

inhibition against an increase of salary during the term of office. See *Land v. Lewis,* 299 Ky. 866, 186 S.W.2d 803 (1945); *State ex rel. Tomka v. Janing,* 183 Neb. 76, 158 N.W.2d 213 (1968); *State ex rel. Goodwin v. Rogers,* 217 S.E.2d 65 (W.Va.1975); *Hawkins v. City of Fayette,* 604 S.W.2d 716 (Mo.App.1980); Annot., 159 A.L.R. 606; Annot., 170 A.L.R. 1438.

Lieutenant Governor. The additional duties given to the Lieutenant Governor under Article V, § 7 are purely within the discretion and province of the Governor.

■ Bearing in mind the principles of statutory construction enunciated earlier, coupled with the fact that the duties assigned to the Lieutenant Governor are not germane to his office, we cannot conclude that the method of compensation provided to the Lieutenant Governor under House Bill No. 1648 for the additional duties which he performs violates Article V, § 14. If it were to be argued that all duties assigned to the Lieutenant Governor are germane, this argument ignores the fact that the primary functions of the office of Lieutenant Governor have been assigned by the North Dakota Constitution. To assume that the Governor could delegate substantial duties to the Lieutenant Governor so as to convert the office to a full-time one and yet expect the remuneration for the performance of the duties to remain at the amount specified in § 54-08-03, N.D.C.C., would be both unreasonable and unjust. For this reason we conclude that House Bill No. 1648 does not violate Article V, § 14. We are not suggesting that the salaries of executive officers may be increased merely by adding to their duties; rather, our decision is based upon the determination of whether or not the added duties are germane to the office.

IV

■ The State Auditor and the State Treasurer contend that although House Bill No. 1648 was declared to be an emergency measure by the Legislature, House Bill No. 1648 contains no language which would allow the funds to be available prior to July 1, 1981, by virtue of Article IV, § 41 of the North Dakota Constitution, which provides:

"*Section 41.* No Act of the legislative assembly shall take effect until July first after the close of the session, unless the legislature by a vote of two-thirds of the members present and voting, in each house, shall declare it an emergency measure, which declaration shall be set forth in the Act, provided, however, that no Act granting a franchise or special privilege, or Act creating any vested right or interest other than in the state, shall be declared an emergency measure. An emergency measure shall take effect and be in force from and after its passage and approval by the governor."

The Governor and the Director of the Department of Accounts and Purchases, however, contend that the performance of the additional duties by the Lieutenant Governor necessarily implies that funds provided for under House Bill No. 1648 should be immediately available for compensation of the Lieutenant Governor. The parties contend that the conflict over when the funds are available to compensate the Lieutenant Governor arose because Section 1 of House Bill No. 1648 states:

"SECTION 1. APPROPRIATION. There is ... appropriated ... the sum of $87,000 ... to the governor's office for the purpose of defraying the expenses of additional duties of the lieutenant governor prescribed by the governor for the biennium beginning July 1, 1981, and ending June 30, 1983."

Section 4 of House Bill No. 1648 provides:

"Section 4. EMERGENCY. This Act is hereby declared to be an emergency measure and shall be in full force and effect from and after its passage and approval."

House Bill No. 1648 was approved on April 1, 1981.

No conflict exists between Article IV, § 41 and House Bill No. 1648 because House Bill No. 1648 was declared to be an emergency measure, which changes the effective date of a statute from the generally effective date of a statute not declared to be an emergency measure. We believe that the Legislature intended House Bill No. 1648 to become effective on April 1, 1981. On that date the Governor signed the bill and it became law. The Legislature in previous sessions has consistently used language in enacting an appropriation measure which specifies that a sum of money is to be used for a subsequent biennium; yet within the

same appropriation measure, the Legislature has inserted an emergency clause. The language in the emergency clause controls even though the Legislature uses language stating that the money is appropriated for the period commencing with July first of the subsequent biennium.[4] Section 4 of House Bill No. 1648 explicitly provides that it was to be effective "from and after its passage and approval". Even if we accept the parties' argument that a conflict exists in the language of House Bill No. 1648, we note that a rule of statutory construction exists which provides that the clause last in order of date or position shall prevail. Section 1–02–08, N.D.C.C., provides:

> "1–02–08. *Conflicting provisions found in the same statute.* Except as otherwise provided in section 1–02–07, whenever, in the same statute, several clauses are irreconcilable, the clause last in order of date or position shall prevail."

Section 1–02–08 applies to clauses as well as to sentences. *City of Fargo, Cass County v. State*, 260 N.W.2d 333 (N.D.1977). Because Section 4 contains the last clause and sentence in House Bill No. 1648, we conclude that it takes precedence over Section 1 of House Bill No. 1648, insofar as the effective date of House Bill No. 1648 is concerned.

## V

■ The final issue is concerned with whether or not the Legislature has the authority to appropriate money to one constitutionally mandated office for the benefit of another constitutionally mandated office. House Bill No. 1648 provides for an appropriation of funds to the Governor's office to compensate the Lieutenant Governor for the additional duties which he is to perform. The State Auditor and the State Treasurer contend that the appropriation called for by House Bill No. 1648 should be made directly available to the Lieutenant Governor because his office is specifically provided for

by the North Dakota Constitution. This argument ignores the essential fact that it is the Governor, and not the Lieutenant Governor, who assigns the majority of the duties which the Lieutenant Governor is to perform. Because the office of Lieutenant Governor is basically dependent upon the office of Governor for the determination of which duties the Lieutenant Governor is to perform, it was not improper for the Legislature to appropriate the funds to the Governor's office. For these reasons we refuse to issue a writ of injunction and hold that the Lieutenant Governor is entitled to receive compensation for additional duties performed at the direction of the Governor and reimbursement for expenses incurred in the performance thereof from the funds provided by House Bill No. 1648 of the Forty-seventh Legislative Assembly of the State of North Dakota.

ERICKSTAD, C. J., and VANDE WALLE and SAND, JJ., concur.

PEDERSON, Justice, dissenting.

Although I agree with much that is said in the majority opinion, particularly in Parts I, II and V, and I believe that there may be considerable merit in the Governor's desire to utilize the talents of the Lieutenant Governor, I think that under the North Dakota Constitution as it stands today, the State of North Dakota is entitled to a remedial writ in this case even though perhaps not in the form suggested by the State Auditor and the State Treasurer. "This Court, in the exercise of its original jurisdiction, may frame its process as the exigencies require." *State ex rel. Link v. Olson*, 286 N.W.2d 262, 268 (N.D.1979).

Parts III and IV of Justice Paulson's opinion clearly set up straw men and then proceed to knock them down. Pronouncements that provisions in the Constitution are ambiguous or in conflict with each other do not make it so. There are many canons of construction that this court has used over the years when interpreting our Constitu-

---

4. For example, see 1971 S.L., Chs. 46, 58; 1973 S.L., Ch. 19; 1975 S.L., Chs. 3, 25, 31; 1977 S.L., Chs. 1, 15, 22; 1979 S.L., Chs. 28, 41, 42.

tion, our statutes, or anything that is written—and basic to all these rules is the cardinal rule that words will be reconciled or harmonized if possible. *McCarney v. Meier*, 286 N.W.2d 780, 783 (N.D.1979); *Cardiff v. Bismarck Public School Dist.*, 263 N.W.2d 105, 107 (N.D.1978).

If there are statutes or executive orders that conflict with constitutional provisions, no reconciliation is necessary and the statute or executive order must yield. As I perceive the question before this court, we should initially address the several applicable provisions of the Executive Article of the North Dakota Constitution and we should not disregard their clear and unambiguous language under the pretext of pursuing their spirit (§ 1–02–05, NDCC).

Pursuant to the provisions of Article V, Section 2, of the North Dakota Constitution, if the governor dies, is impeached, resigns, fails to qualify, is absent from the state, is removed from office, or is disabled, the lieutenant governor assumes all powers and duties of the office of governor. Article V, Section 7, after describing the lieutenant governor's powers and duties in the legislative assembly, states that "additional duties shall be prescribed by the governor."

I have no difficulty harmonizing those provisions. Obviously the assignment of additional duties by the governor under Section 7 must not interfere with the lieutenant governor's constitutional duties to act as governor when the occasion requires, as outlined in Section 2, nor with the lieutenant governor's duties to preside over the senate during meetings of the legislative assembly, as specified in Section 7.

Using the same rationale, I find no disharmony between Sections 2 and 7, on the one hand, and Section 14 of Article V on the other hand. Section 14 provides in pertinent part that "salaries of . . . [public officers, including the lieutenant governor] shall not be increased or diminished during the period for which they shall have been elected." The salary of the lieutenant governor may not be increased when he is assigned additional duties by the governor any more than it may be increased when the governor is absent from the state a few days, or when he presides over the senate.

The prohibition against salary increases or decreases during an elected officer's term has existed since the adoption of this State's original constitution in 1889. The same is true of the constitutional assignment to the lieutenant governor of legislative duties and executive duties when the governor is not eligible or able to perform. The authority of the governor to assign "additional duties" to the lieutenant governor, however, was only added to the Constitution in 1974. (See S.L. 1973, Ch. 531, and S.L. 1975, Ch. 605.) A number of efforts have been made seeking the repeal of the prohibition against salary increases. (See, e. g., Article V, Section 4, Proposed 1972 Constitution, disapproved April 28, 1972—S.L. 1973, Ch. 529, "The compensation of elected officials shall be as provided by law, but shall not be diminished during the term for which they were elected.")

This court held in *Newman v. Hjelle*, 133 N.W.2d 549 (N.D.1965), at syllabus 7:

"The sole object sought in construing a constitutional provision is to ascertain and give effect to the intention and purpose of the framers and of the people who adopted it, and all rules of construction are subservient to and intended to effectuate such objects. Primarily such intention and purpose are to be found in and deduced from the language of the Constitution itself but, if the language is ambiguous or the answer doubtful, then the field of inquiry is widened and the rules applicable to the construction of statutes are to be resorted to, and the court may look to the history of the times and examine the state of being existing when the question was framed and adopted by the people in order to ascertain the prior law, the mischief, and the remedy."

Conspicuously absent from the majority opinion is any convincing analysis justifying the conclusion apparently reached—to wit, that the object of the framers of the amendment (the legislative assembly) and of the people who voted for the amendment of Article V, Section 7, in 1974, to authorize

the governor to assign additional duties to the lieutenant governor, Article V, Section 14, would be amended or repealed by implication so as to abolish the prohibition against salary increases for elected officials during the term for which they were elected. In my view, the language used by the legislative assembly in proposing the constitutional amendment, its conduct before and after making the proposal, as well as anything discernable from the history of the times and the mischief to be remedied, all militate against any thought that the people of this State have had any intention to eliminate the long-standing prohibition against salary increases in any form or for any reason for an elected state official during the term for which he was elected.

In *Walker v. Omdahl,* 242 N.W.2d 649, 658 (N.D.1976), the majority of this court said:

"... we must conclude that expenses beyond the allowances for expenses in the previous session of the Legislature which exceed amounts reasonably necessary to cover increases in the cost of living are salary, and thus violative of Section 84 of the Constitution." [The reference to Section 84 relates to the prohibition which is now Article V, Section 14.]

In a special concurring opinion in *Walker v. Omdahl, supra,* I expressed the view that this court was leaving the door open to manipulations to evade a constitutional prohibition. The teeth that were left in the bar to salary increases by the majority in *Walker v. Omdahl* are completely removed by the majority in this case.

Although all of the present justices did not participate in *State ex rel. Link v. Olson, supra,* the decision was unanimous. Two conclusions most readers reach when studying that opinion are that (1) there was doubt as to the constitutionality of the additional salary for the lieutenant governor when he performed the additional duties of federal aid coordinator pursuant to assignment by the governor, and (2) there was doubt as to the constitutionality of a change in the nature of the position of lieutenant governor pursuant to assignment by the governor. This court refrained from at-tempting to settle those two questions because they were not appropriately raised. See *State ex rel. Link v. Olson, supra,* 286 N.W.2d at 273–274.

The best illustration of the intent of the legislative assembly and its understanding of the prohibition against salary increases for the lieutenant governor, even though his duties are expanded, is found in Section 7 of Chapter 539, S.L. 1979. That section proposed to amend § 54–08–03, NDCC; as follows:

"54–08–03. SALARY OF LIEUTEN-ANT GOVERNOR. The lieutenant governor shall receive an annual salary ~~of eight thousand dollars~~ for all services performed by him of eight thousand dollars effective January 1, 1981; eight thousand four hundred dollars effective January 1, 1982; eight thousand eight hundred twenty dollars effective January 1, 1983; nine thousand two hundred sixty dollars effective January 1, 1984; and nine thousand seven hundred thirty dollars effective January 1, 1985. If the duties of the lieutenant governor are expanded prior to January 1, 1981, pursuant to the Constitution, statute, or appropriate executive order, so as to require substantially full-time service from the lieutenant governor to carry out those duties, then the annual salary of the lieutenant governor shall be as follows: effective January 1, 1981, thirty-three thousand five hundred dollars; thirty-five thousand one hundred seventy-five dollars effective January 1, 1982; thirty-six thousand nine hundred thirty-three dollars effective January 1, 1983; thirty-eight thousand seven hundred eighty dollars effective January 1, 1984; and forty thousand seven hundred twenty dollars effective January 1, 1985."

[Dashes indicate deleted material; underlined portion indicates new language in the Bill. All contained in the original.]

The significant part of Chapter 539, S.L. 1979, which clearly spells out the legislative assembly's understanding of the constitutional prohibition, is found in § 13, which states:

"The provisions of this Act shall become effective ten days after the effective date of the proposed repeal of section 39 of the Constitution of North Dakota as contained in Senate Concurrent Resolution No. 4061 [Ch. 707, S.L. 1979] as adopted by the forty-sixth legislative assembly. If the proposed repeal of section 39 of the Constitution is rejected by the electorate at the primary election in 1980, then this Act shall be of no force and effect."

Why the drafters of Chapter 539 (the Senate Committee on Appropriations) thought that salary increases for elected officials should be contingent on eliminating the prohibitions in former § 39 (now Article IV, § 17) is a mystery. It is apparent that confusion existed as to the relationship between the prohibition in former § 84 (now Article V, § 14) against salary increases and the prohibition in former § 39 (now Article IV, § 17) against legislators serving in a position, the emoluments of which shall have been increased during their term as legislators.

The proposed repeal of former § 39 barring members of the legislature from serving in offices which have had salary increases was rejected by the people of North Dakota in the primary election on September 2, 1980, thus the salary increases provided for in Chapter 539, S.L. 1979, never became effective. See also, footnote 2 in *State ex rel. Link v. Olson, supra,* 286 N.W.2d at 264.

It appears to me that the majority opinion rests on thin ice when it finds an exception to the bar against salary increases for duties that are assigned to the lieutenant governor which are not germane to the office of lieutenant governor. If that can support a salary increase for the lieutenant governor when the governor assigns him non-germane duties, what would prevent a legislative assembly that wishes to grant a salary increase to other elected officials from supporting the salary raise with an assigned non-germane duty? The answer from the majority opinion is obvious—all obstacles to salary increases for elected officials have been effectively eliminated and

Article V, § 14, is, in effect, stricken from the constitution—repealed by implication.

Another serious question arises when the duties assigned by the governor to the lieutenant governor are labeled "non-germane." We have held that the common law rule of incompatibility is the law of this state. *Tarpo v. Bowman Public Sch. Dist. No. 1,* 232 N.W.2d 67 (N.D.1975). For the governor to assign duties to the lieutenant governor which are beyond the scope of the office to which the lieutenant governor was elected, in effect creates a new, separate, and distinct office with obligations and loyalties which may very well conflict with the constitutional obligations of the lieutenant governor. If, on the other hand, it be contended that the constitutional obligations of the lieutenant governor include those additional duties that may be, from time to time, assigned by the governor, then, of course, those duties are germane to the office of lieutenant governor and on which no salary increase can be based.

To further illustrate the faulty conclusion of the majority, imagine for a moment the situation should a lieutenant governor decline to perform non-germane assignments for the governor, or should a future legislative assembly decline to appropriate funds to make additional salary payments to a lieutenant governor who has been assigned additional duties. Are we now saying that a lieutenant governor cannot do as some candidates said before the primary—that they were seeking a part-time position only? Is this court prepared to require a legislative appropriation of additional salary to the lieutenant governor on the theory that neither the people nor the legislative assembly can, without a constitutional amendment, refuse to fund a constitutionally mandated function? See *State ex rel. Walker v. Link,* 232 N.W.2d 823 (N.D.1975). Potentially, the future is a Pandora's box which I would not care to open.

Part IV of the majority opinion clearly illustrates a faulty syllogism. Merely because the legislative assembly has made the same mistake before, as pointed out by Jus-

tice Paulson in footnote 4, should not make it correct. And to even think that the legislative assembly, by exempting all requirements to keep a record, intended to turn an appropriation into an unaccountable slush fund, is wholly unacceptable, and no amount of rules of construction would make it so. Certainly, neither the legislative assembly nor the majority opinion use the label "slush fund," but even the most casual reading of the provisions of §§ 54–27–10 and 54–27–11, which were excepted for application to the funds in question, leaves the inference that the expenditure of those funds can be totally irresponsible. That is so absurd that this court should declare the entire Act invalid as violative of Article X, § 18, which prohibits donations except for the reasonable support of the poor.

I would design an appropriate writ that would accomplish these purposes, and I commend the State Auditor, the State Treasurer, and the Attorney General for their integrity in instituting this application.