Opinion on Motion for Clarification and Motion for Stay Filed October 12, 2023

**FILED**
**IN THE OFFICE OF THE**
**CLERK OF SUPREME COURT**
**SEPTEMBER 28, 2023**
**STATE OF NORTH DAKOTA**

# IN THE SUPREME COURT
# STATE OF NORTH DAKOTA

## 2023 ND 185

Board of Trustees of The North Dakota Public

Employees Retirement System,                                   Petitioner

v.

North Dakota Legislative Assembly,                             Respondent

## No. 20230158

Petition for Declaratory Relief and Writ of Injunction.

DECLARATORY JUDGMENT AND WRIT OF INJUNCTION GRANTED, AND MOTION TO SUPPLEMENT THE RECORD DENIED.

Opinion of the Court by Justice Crothers, in which Justice Tufte joined. Chief Justice Jensen filed an opinion concurring specially. Justice McEvers filed an opinion concurring specially in which District Judge Lee joined.

Robert D. Klausner (argued), Plantation, FL, Christopher Rausch (appeared) and Elizabeth A. Elsberry (appeared), Bismarck, ND, Lindsey M. Garber (on brief) and Sean M. Sendra (on brief), Plantation, FL, Special Assistant Attorneys General, for Petitioner.

Philip J. Axt, Solicitor General, Bismarck, ND, for Respondent.

**Bd. of. Trustees of The N.D. Public Employees Retirement System v. N.D. Legislative Assembly**
**No. 20230158**

**Crothers, Justice.**

[¶1] The Board of Trustees of the North Dakota Public Employees Retirement System petitions this Court seeking declaratory relief and a writ of injunction, challenging N.D.C.C. § 54-52-03 and section 41 of S.B. 2015 (2023), enacted by the 68th Legislative Assembly, both of which provide for the appointment of sitting legislators to the Board. The Board claims the law placing legislators on the Board violates N.D. Const. art. IV, § 6; violates the separation of powers between branches of government and encroaches on the powers of the executive branch in violation of articles IV, V and XI of the Constitution; violates the common-law rule against incompatibility of office; and violates the single subject rule of N.D. Const. art. IV, § 13. We grant the requested review, conclude section 41 of S.B. 2015 violated article IV, § 13 of the North Dakota Constitution, and invalidate S.B. 2015. Because the constitutional "single subject" rule is dispositive, it is unnecessary to address the Board's remaining claims.

[¶2] Subsequent to oral argument, the Board requested leave to supplement the record with information arising after the initiation of the petition for declaratory relief and the request for a writ of injunction. The additional information is not relevant to the dispositive issue and the motion is denied.

I

[¶3] On June 1, 2023, the Board petitioned this Court to exercise its original jurisdiction under N.D.C.C. § 27-02-04, seeking declaratory relief under N.D.C.C. § 32-23-01 and a writ of injunction under N.D.C.C. § 32-06-01. The Board filed a motion for a preliminary injunction before the hearing, which this Court denied.

[¶4] The Board seeks a declaration that section 41 of S.B. 2015 is void ab initio and N.D.C.C. § 54-52-03 is invalid, both of which provide for appointment

of sitting legislators to the Board, because they violate article IV, § 6 of the North Dakota Constitution, the separation of powers requirement under articles IV, V and XI of the Constitution, and the common-law doctrine of incompatibility of office. The Board also seeks a declaration that S.B. 2015 is invalid because the joinder of an appropriation bill with an amendment to the Board's structure is not germane, constitutes "logrolling," and is in violation of article IV, § 13 of the Constitution. The Board requests a writ of injunction preventing the appointment of additional legislators and the continued service of sitting legislators on the Board.

[¶5]  Section 54-52-03, N.D.C.C., after the recent amendments, provides:

> "1. A state agency is hereby created to constitute the governing authority of the system to consist of a board of *eleven* individuals known as the retirement board. No more than one elected member of the board may be in the employ of a single department, institution, or agency of the state or in the employ of a political subdivision. An employee of the public employees retirement system or the state retirement and investment office may not serve on the board.
>
> 2. *Four members of the legislative assembly* must be appointed to serve on the board. The majority leader of the house of representatives shall appoint *two members of the house of representatives* and the majority leader of the senate shall appoint *two members of the senate*. The members appointed under this subsection shall serve a term of two years.
>
> 3. Four members of the board must be appointed by the governor to serve a term of five years. Each appointee under this subsection must be a North Dakota citizen who is not a state or political subdivision employee and who is familiar with retirement and employee benefit plans. The governor shall appoint one citizen member to serve as chairman of the board.
>
> 4. Three board members must be elected by and from among the active participating members, members of the retirement plan established under chapter 54-52.6, members of the retirement plan

established under chapter 39-03.1, and members of the job service North Dakota retirement plan. Employees who have terminated their employment for whatever reason are not eligible to serve as elected members of the board under this subsection. Board members must be elected to a five-year term pursuant to an election called by the board. Notice of board elections must be given to all active participating members. The time spent in performing duties as a board member may not be charged against any employee's accumulated annual or any other type of leave.

5. The members of the board are entitled to receive one hundred forty-eight dollars per day compensation and necessary mileage and travel expenses as provided in sections 44-08-04 and 54-06-09. This is in addition to any other pay or allowance due the chairman or a member, plus an allowance for expenses they may incur through service on the board.

6. A board member shall serve until the board member's successor qualifies. Each board member is entitled to one vote, and *six of the eleven* board members constitute a quorum. Six votes are necessary for resolution or action by the board at any meeting."

(Emphasis added.) Section 41 of S.B. 2015 amended N.D.C.C. § 54-52-03 by increasing the number of Board members from nine to eleven and changing the number of appointed legislators from two to four. *See* N.D.C.C. § 54-52-03(1), (2) and (6); 2023 N.D. Sess. Laws ch. 47, § 41.

II

[¶6] The Board argues this Court should exercise original jurisdiction because its petition raises issues of "paramount importance to the interests of the State and the citizens of North Dakota[.]" The Legislative Assembly agrees. Article VI, § 2 of the North Dakota Constitution and N.D.C.C. § 27-02-04 provide original jurisdiction to the Court for writs of habeas corpus, mandamus, quo warranto, certiorari, and injunction. "This authority is discretionary and cannot be invoked as a matter of right." *State ex rel. Peterson v. Olson,* 307 N.W.2d 528, 531 (N.D. 1981). "The Supreme Court will determine for itself, on an *ad hoc* basis, whether or not a particular case is within its

original jurisdiction." *Id*. (citing *State ex rel. Link v. Olson*, 286 N.W.2d 262 (N.D. 1979); *State ex rel. Vogel v. Garaas*, 261 N.W.2d 914 (N.D. 1978)).

[¶7]   "It is well-settled that [this Court] invoke[s] our original jurisdiction only in cases *publici juris* and those affecting the sovereignty of the state, its franchises and prerogatives, or the liberties of its people." *N.D. Legis. Assembly v. Burgum*, 2018 ND 189, ¶ 4, 916 N.W.2d 83 (cleaned up). "The interests of the State must not be merely incidental but must be of primary importance, and the public must have an interest or right which may be affected." *Peterson*, 307 N.W.2d at 531. We have exercised original jurisdiction in cases where the separation of coequal branches of government and their respective authority have been challenged. *See, e.g., Burgum*, at ¶ 10; *N.D. State Bd. of Higher Educ. v. Jaeger*, 2012 ND 64, ¶ 13, 815 N.W.2d 215; *Peterson*, 307 N.W.2d at 531; *Link*, 286 N.W.2d at 266-67.

[¶8]   In *Burgum*, we addressed the vetoing power of the governor and limits of the legislature's power over exercise of executive authority. 2018 ND 189, ¶ 10. In exercising original jurisdiction, this Court determined, "[t]hese issues concern the balance of powers between the legislative and executive branches . . . . Because our constitution provides for a separation of legislative, executive, and judicial powers, actions which tend to undermine this separation are of great public concern." *Id*. In *Peterson*, this Court examined powers of certain executive branch agency heads, and the legislature's ability to appropriate funds to pay for expanded duties imposed on the lieutenant governor. 307 N.W.2d at 530-31. The primary reason for exercising original jurisdiction in *Peterson* was "[b]ecause these challenges relate to the very foundation upon which the executive and legislative branches of government rest[.]" *Id*. at 531.

[¶9]   Similar to *Burgum* and *Peterson*, the issues in this case involve the constitutionality of the legislative branch's decision to place legislators on an executive agency governing board. These issues concern the balance of powers between the legislative and executive branches of government. Because the legislature's actions could undermine that balance, the petition presents a controversy of "significant public interest that justif[ies] exercise of our original

jurisdiction." *Burgum*, 2018 ND 189, ¶ 10. We choose to exercise original jurisdiction in this case.

III

[¶10] The Board argues S.B. 2015 violates N.D. Const. art. IV, § 13, by embracing more than one subject. The Board asserts S.B. 2015 is an "appropriation bill," and S.B. 2015, § 41, which also reenacts N.D.C.C. § 54-52-03 by changing the NDPERS Board's composition, is not germane to the subject expressed in the title of the bill. The Board argues section 41 should be declared invalid. The Legislative Assembly disagrees with the Board's characterization of S.B. 2015. It argues S.B. 2015 is "not merely an appropriations bill" and is instead a "more comprehensive bill pertaining to State government operations." We agree with the Board and conclude S.B. 2015 was unconstitutionally enacted and is void.

A

[¶11] Whether legislation is unconstitutional is a question of law that is fully reviewable by this Court. *Teigen v. State*, 2008 ND 88, ¶ 7, 749 N.W.2d 505. We interpret legislative enactments and constitutional provisions according to the same principles of statutory construction. *Sorum v. State*, 2020 ND 175, ¶ 19, 947 N.W.2d 382 (citing *State ex rel. Heitkamp v. Hagerty*, 1998 ND 122, ¶ 13, 580 N.W.2d 139). Our framework for construing constitutional provisions is well established:

> "We aim to give effect to the intent and purpose of the people who adopted the constitutional provision. [*Heitkamp,* at ¶ 13]. We determine the intent and purpose of a constitutional provision, 'if possible, from the language itself.' *Kelsh v. Jaeger*, 2002 ND 53, ¶ 7, 641 N.W.2d 100. 'In interpreting clauses in a constitution we must presume that words have been employed in their natural and ordinary meaning.' *Cardiff v. Bismarck Pub. Sch. Dist.*, 263 N.W.2d 105, 107 (N.D. 1978).
>
> "A constitution 'must be construed in the light of contemporaneous history—of conditions existing at and prior to its adoption. By no other mode of construction can the intent of its

5

framers be determined and their purpose given force and effect.' [*Heitkamp*, at ¶ 17] (quoting *Ex parte Corliss*, 16 N.D. 470, 481, 114 N.W. 962, 967 (1907)). Ultimately, our duty is to 'reconcile statutes with the constitution when that can be done without doing violence to the language of either.' *State ex rel. Rausch v. Amerada Petroleum Corp.*, 78 N.D. 247, 256, 49 N.W.2d 14, 20 (1951). Under N.D. Const. art. VI, § 4, we 'shall not declare a legislative enactment unconstitutional unless at least four of the members of the court so decide.'"

*Sorum*, at ¶¶ 19-20. When North Dakota adopts a statutory or constitutional provision from another jurisdiction, we presume the language was adopted with knowledge of the interpretation given to it by the source jurisdiction. *Id.* at ¶ 30 (citing *State ex rel. McCue v. Blaisdell*, 119 N.W. 360, 365 (N.D. 1909)).

B

[¶12] North Dakota Constitution art. IV, § 13 provides in relevant part:

"No law may be enacted except by a bill passed by both houses, and no bill may be amended on its passage through either house in a manner which changes its general subject matter. No bill may embrace more than one subject, which must be expressed in its title; but a law violating this provision is invalid only to the extent the subject is not so expressed."

This single subject requirement initially was adopted as section 61 of the 1889 Constitution, which provided: "No bill shall embrace more than one subject, which shall be expressed in its title, but a bill which violates this provision shall be invalidated thereby only as to so much thereof as shall not be so expressed." The original "one subject" rule was renumbered in 1981 as section 33, and the language was modernized to its current form by an amendment approved on November 6, 1984, effective December 1, 1986. *See* N.D.C.C. § 46-03-11.1; 1985 N.D. Sess. Laws ch. 707, § 2; 1983 N.D. Sess. Laws ch. 730, § 2. We have found no authority suggesting the modifications from 1889 to the present were intended to substantively change the single subject provision. Nor have the parties to this proceeding cited us to authority or suggested the 1980s modifications to the "one-subject" restriction were substantive.

6

[¶13] When North Dakota adopted its original constitution in 1889, a large majority of states had constitutional provisions limiting legislation to one subject. *See State ex rel. Goodsill v. Woodmanse*, 46 N.W. 970, 971 (N.D. 1890); *see also State ex rel. Standish v. Nomland*, 57 N.W. 85, 86 (N.D. 1893) ("The equivalent of this provision is found in the constitution of nearly every state in the Union, and few provisions have been oftener before the courts for construction."); J.G. Sutherland, *Statutes and Statutory Construction* 83-85 (1891) (listing provisions). Beginning with our earliest decisions interpreting the single subject rule, we have cited leading treatises and prominent decisions of other states to explain the purpose of the rule and its appropriate application. *See, e.g.*, *Goodsill*, at 971-72 (citing Thomas M. Cooley, *Constitutional Limitations* 176 (5th ed. 1883) to explain the purpose of the one-subject rule is to prevent "log-rolling" and legislation not fully understood by members of the legislature or surprises to the public). In the early years following statehood, we expressed agreement with the leading treatises by Cooley and Sutherland, and the decisions of several states, that our interpretation of this provision should not be rigid, but we should "construe the constitutional provision liberally." *Standish*, at 86 (invalidating act creating the State Board of Auditors as violative of the single subject rule).

[¶14] The two requirements in N.D. Const. art. IV, § 13 pertinent to this case are that "[n]o bill may embrace more than one subject" and that the subject of the bill "must be expressed in its title." The title and one subject requirements of section 13 are distinct, and they serve different purposes. *See S.D. Educ. Assoc. v. Barnett*, 582 N.W.2d 386, 393 (S.D. 1998) (interpreting South Dakota's nearly identical constitutional provision to "contain two requirements"); *see also Porten Sullivan Corp. v. State*, 568 A.2d 1111, 1118 (Md. 1990) (explaining Maryland's similar provision has two objectives). Transparency is the reason for requiring the subject of a bill to be expressed in its title. The title requirement ensures the public is informed of the matters within a bill, and it prevents legislators from unknowingly passing legislation "inserted in a bill of which the title gives no intimation." *S.D. Educ. Assoc.*, at 393. "It was designed to give all parties general notice of what the act contained so that the legislators might protest against unsatisfactory measures and clauses, and the

public could in turn protest to their representatives." *State ex rel. Gaulke v. Turner*, 164 N.W. 924, 928 (N.D. 1917).

[¶15] The purpose of prohibiting multiple subjects is to curtail logrolling—"[t]o prevent the combining into one bill of several diverse measures which have no common basis except, perhaps, their separate inability to receive a favorable vote on their own merits[.] *S.D. Educ. Assoc.*, 582 N.W.2d at 393. The rule also facilitates the balance of power between the executive and legislative branches by enabling "the governor to consider each piece of legislation separately in determining whether to exercise veto power." *Parrish v. Lamm*, 758 P.2d 1356, 1362 (Colo. 1988); *see also* N.D. Const. art. V, § 9 (limiting the governor's item veto power to appropriation bills); *Link*, 286 N.W.2d at 268 (stating bills not concerning appropriation "must be approved or disapproved in total"). Under the single subject rule, a bill may include matters "naturally and reasonably connected with the subject of the act as expressed in the title." *Lapland v. Stearns*, 54 N.W.2d 748, 752, (N.D. 1952). We apply the single subject rule liberally to uphold legislation when its parts are reasonably germane to a central object or purpose. *Great N. Ry. Co. v. Duncan*, 176 N.W. 992, 996 (N.D. 1919).

[¶16] This Court has interpreted the constitution's single subject language as providing the Legislative Assembly with considerable flexibility in defining the subject of legislation and in determining what provisions are germane to that one subject such that they may be included in a single bill. *See, e.g., Eaton v. Guarantee Co. of N.D.*, 88 N.W. 1029 (N.D. 1902) ("The section of the constitution relied upon by counsel has uniformly and very properly received a liberal construction at the hands of the courts; and this court quite recently, as well as in its earlier decisions, has applied this rule of construction."). When determining whether the subject of a bill is expressed in its title, we avoid strict and technical interpretation and construe the title liberally. *Lapland,* 54 N.W.2d at 752. The title should be read considering the "evident object and purpose" of the legislation. *State ex rel. Poole v. Peake*, 120 N.W. 47, 49 (N.D. 1909). "It is sufficient if the title, either by express words or by necessary or reasonable implication from the meaning of its terms, includes the subject and

8

purposes of the act . . . ." *Id.* at 50. This Court has analyzed whether a person reading the words in a title "will be apprised of and will naturally look for provisions of the act" relating to those words. *Id.* at 49. "If the Legislature is fairly appraised of the general character of an enactment by the subject as expressed in its title . . . then the requirement of the Constitution is complied with." *Gaulke*, 164 N.W. at 928 (quoting *State v. Cassidy*, 22 Minn. 312, 324 (1875)). "The title of an act may and does limit and confine the content of the act itself, but the terms of the act cannot amplify and broaden the title." *Dornacker v. Strutz*, 1 N.W.2d 614, 616 (N.D. 1941) (citing *Olson v. Erickson*, 217 N.W. 841 (N.D. 1928); 1 Lewis Sutherland, *Statutory Construction* § 120 (2d ed. 1904)). "If this were not so the constitutional requirement would be wholly futile." *Dornacker*, at 616.

[¶17] This Court has recognized five guides applicable to single subject challenges to legislation:

> "This section of the Constitution has been construed by this court in several cases. In those cases several principles have been laid down as guides in the construction of the section that should be applied in this case: (1) The law will not be declared unconstitutional on account of the defect unless it is clearly so. (2) The title should be liberally construed, and not in a strict or technical manner. (3) If the provisions of the act are germane to the expressions of the title, the law will be upheld. (4) The object to be gained by the enactment and enforcement of the constitutional provision is to advise the Legislature and the public of the substance of the act and to prevent surprise, fraud, and the enactment of laws upon incongruous and independent matters under one title. (5) The section of the Constitution is mandatory upon the Legislature and upon the courts."

*Powers Elevator Co. v. Pottner*, 113 N.W. 703, 704 (N.D. 1907).

[¶18] We have applied these guides in a manner that demonstrates legislation may violate the single subject rule in more than one way. "If it embrace two subjects, and both are fully expressed in the title, still the provision is clearly violated." *Richards v. Stark County*, 79 N.W. 863, 864 (N.D. 1899). If a bill

embraces more than one subject and only one subject is expressed in the title, the provisions not germane to the subject expressed in the title are invalid. *Divet v. Richland County*, 76 N.W. 993, 995 (N.D. 1898) ("In the case at bar the body of the act is broader than its title, and hence it must be annulled in so far as it transcends the title and is inconsistent therewith."). If an act "embraces but one subject, and that subject be not expressed in the title, the provision is equally violated." *Richards,* at 864. The provision expressly provides the remedy for a bill embracing multiple subjects, only one of which is expressed in the title: the provisions relating to the subject expressed in the title are valid, and the unrelated matters are invalid and severed. *Id.*; *People ex rel. City of Rochester v. Briggs*, 50 N.Y. 553 (1872). The limits of the rule are illustrated where a bill embraces only one subject but has a title referencing that one subject as well as one or more other subjects. *Eaton,* 88 N.W. at 1029.

C

[¶19] The Legislative Assembly argues: (1) "this Court has construed the single subject rule loosely," citing cases reflecting a broad approach to what provisions are "reasonably germane" to the subject of the legislation; (2) the "broad subject" of S.B. 2015 is "a more comprehensive bill pertaining to State government operations, and of NDPERS particularly;" (3) the decisions of this Court invalidating legislation as violative of the one-subject rule are "antiquated and rare;" and (4) the law has a "presumption of constitutionality" that would require us to resolve any doubt as to the constitutionality of legislation in favor of validity.

1

[¶20] We agree with the Legislative Assembly that all statutes enjoy a presumption of constitutionality. *State v. Holbach*, 2009 ND 37, ¶ 23, 763 N.W.2d 761. However, that begins rather than resolves the question before us.

[¶21] Many of the Legislative Assembly's arguments can be read to claim the single subject limitation has no current viability as a constitutional doctrine or as a basis for the judiciary acting as a check on the legislative branch. We reject those arguments as incomplete. First, N.D. Const. art. IV, § 13 is a valid and

10

active part of our fundamental law, the Constitution. Second, construing S.B. 2015 consistent with the guiding principles first announced in *Powers Elevator Co.* as described above, and acting within the judicial constraints described by our sister states, does not mean no judicially enforceable limits exist for the breadth of a legislative subject or whether a provision is germane to that subject. As explained by the California Supreme Court:

> "For example, the rule obviously forbids joining disparate provisions which appear germane only to topics of excessive generality such as 'government' or 'public welfare.' . . . subjects of 'excessive generality' would violate the purpose and intent of the single subject rule.
>
> . . . .
>
> "'Fiscal affairs' as the subject of Bill 1379 and 'statutory adjustments' to the budget as its object suffer from the same defect. They are too broad in scope if, as petitioners appear to claim, they encompass any substantive measure which has an effect on the budget. The number and scope of topics germane to 'fiscal affairs' in this sense is virtually unlimited. If petitioners' position were accepted, a substantial portion of the many thousand statutes adopted during each legislative session could be included in a single measure even though their provisions had no relationship to one another or to any single object except that they would have some effect on the state's expenditures as reflected in the budget bill. This would effectively read the single subject rule out of the Constitution."

*Harbor v. Deukmejian*, 742 P.2d 1290, 1303-04 (Cal. 1987).

[¶22] The Legislative Assembly cites various cases where this Court has rejected challenges to legislation under the single subject rule, and it asserts the cases where we have invalidated legislation "appear to be antiquated and rare." It may be true we have not had recent occasion to address N.D. Const. art. IV, § 13, but that is no justification for us not following its mandate. *See Porten Sullivan Corp.*, 568 A.2d at 1118 (stating that despite history of deference to legislative branch, the single subject provision is "still a part of

11

our Constitution" and as such "it is not to be treated as a dead letter"). Many jurisdictions have similar if not identical provisions in their constitutions that have "resulted in the invalidation of substantial and important legislation." Michael D. Gilbert, *Single Subject Rules & the Legislative Process*, 67 U. Pitt. L. Rev. 803, 806 (2006). This issue is not a matter of antiquity. *See, e.g.*, *Douglas v. Cox Retirement Props., Inc.*, 302 P.3d 789, 794 (Okla. 2013) (holding legislation violated single subject rule of state constitution); *People v. Olender*, 854 N.E.2d 593, 605 (Ill. 2005) (same); *St. Louis Health Care Network v. State*, 968 S.W.2d 145, 149 (Mo. 1998) (same).

2

[¶23] The remaining question is whether the title or the body of S.B. 2015 embraces more than "one subject." The Legislative Assembly argues that over 20 of S.B. 2015's 68 sections relate to NDPERS, and asserts that the subject of the bill as expressed by its title is "State government operations, and of NDPERS particularly."

[¶24] Senate Bill 2015 in its original form was introduced on January 3, 2023, had a title containing 35 words, and related only to the Office of Management and Budget:

> A BILL for an Act to provide an appropriation for defraying the expenses of the various divisions under the supervision of the director of the office of management and budget; and to provide an exemption.

[¶25] The Senate amended S.B. 2015 on February 21, 2023, expanding its title to 113 words addressing a number of subjects.

A BILL for an Act to provide an appropriation for defraying the expenses of the various divisions under the supervision of the director of the office of management and budget; to create and enact a new subsection to section 54-44-11 of the North Dakota Century Code, relating to a facility management operating fund; to amend and reenact sections 48-10-02, 54-21-19, and 57-40.3-10 of the North Dakota Century Code, relating to the capitol grounds planning commission spending limit, capitol grounds rent collections, and the allocation of motor vehicle excise tax collections; to provide for a transfer; to provide an exemption; to provide a report; to provide an effective date; and to declare an emergency.

The first engrossment with House amendments passed the House on April 21, 2023, when the title contained 134 words addressing a number of subjects:

A BILL for an Act to provide an appropriation for defraying the expenses of the various divisions under the supervision of the director of the office of management and budget; to provide appropriations to the legislative council and office of the governor; to create and enact a new subsection to section 54-44-11 of the North Dakota Century Code, relating to a facility management operating fund; to amend and reenact sections 48-10-02, 54-21-19, and 54-52-03 of the North Dakota Century Code, relating to the capitol grounds planning commission spending limit, capitol grounds rent collections, the retirement board, and the public employees retirement system retirement plan; to provide for a transfer; to provide an exemption; to provide for a legislative management study; to provide a report; to provide an effective date; and to declare an emergency.

The title of the first engrossment with conference committee amendments contained 675 words and included substantially more appropriations and areas of coverage than any of the prior versions.

[¶26] The final version of S.B. 2015 was passed by both bodies on April 29, 2023. The title of the bill consists of one sentence comprised of 630 words filling a single-spaced page:

AN ACT to provide an appropriation for defraying the expenses of the various divisions under the supervision of the director of the office of management and budget; to provide an appropriation to the office of the governor, legislative assembly, adjutant general, legislative council, department of environmental quality, department of labor and human rights, department of public instruction, department of commerce, department of health and human services, department of career and technical education, and judicial branch; to create and enact a new subsection to section 10-30.5-02 and a new subsection to section 54-44-11 of the North Dakota Century Code, relating to the purpose and use of the North Dakota development fund and a facility management operating fund; to amend and reenact section 15.1-27-04.1 as amended by section 10 of Senate Bill No. 2284, as approved by the sixty-eighth legislative assembly, sections 15.1-36-02 and 15.1-36-04, subsection 2 of the new section to chapter 19-03.1, as created by section 1 of Senate Bill No. 2248, as approved by the sixty-eighth legislative assembly, subsection 1 of section 21-10-12, as amended in section 3 of Senate Bill No. 2330, as approved by the sixty-eighth legislative assembly, section 24-02-37.3, as amended by section 10 of House Bill No. 1012, as approved by the sixty-eighth legislative assembly, sections 48-10-02, 54-06-14.7, and 54-21-19, sections 54-52-02.5, 54-52-02.9, 54-52-02.11, and 54-52-02.12, as amended in sections 3, 4, 5, and 6 of House Bill No. 1040, as approved by the sixty-eighth legislative assembly, section 54-52-02.15 as created by section 7 of House Bill No. 1040, as approved by the sixty-eighth legislative assembly, section 54-52-03, subsection 2 of section 54-52-06.4, as amended in section 1 of House Bill No. 1309, as approved by the sixty-eighth legislative assembly, subsection 4 of section 54-52-17, as amended in section 4 of House Bill No. 1183, as approved by the sixty-eighth legislative assembly, section 54-52.2-09 as created by section 13 of House Bill No. 1040, as approved by the sixty-eighth legislative assembly, subsection 3 of section 54-52.6-01 and section 54-52.6-02 as amended in sections 14 and 15 of House Bill No. 1040, as approved by the sixty-eighth legislative assembly, subsection 1 of section 54-52.6-02.1 and section 54-52.6-02.2 as created by sections 16 and 17 of House Bill No. 1040, as approved by the sixty-eighth legislative assembly, subsection 2 of section 54-52.6-03 as amended by section 18 of House Bill No. 1040, as approved by the sixty-eighth legislative assembly, section 54-52.6-09 as amended in section 22 of House Bill No. 1040, as approved by the sixty-eighth legislative assembly, section 54-63.1-04, and the new subsection to section 61-16.1-11, as created in section 1 of Senate Bill No. 2372, as approved by the sixty-eighth legislative assembly, of the North Dakota Century Code and section 2 of House Bill No. 1438, as approved by the sixty-eighth legislative assembly, relating to baseline funding and the determination of state school aid, loans from the coal development trust fund, evidence of indebtedness, distribution of illegal drugs, legacy fund earnings, the flexible transportation fund, the capitol grounds planning commission spending limit, the state leave sharing program, capitol grounds rent collections, the retirement board, the public employees retirement system retirement plan, the public employees retirement system plan for state peace officers, the clean sustainable energy authority duties, and joint water resource boards; to repeal section 5 of Senate Bill No. 2020, as approved by the sixty-eighth legislative assembly, relating to a transfer of Bank of North Dakota profits to a water infrastructure revolving loan fund; to provide for a transfer; to provide an exemption; to provide for a legislative management study; to provide a report; to provide a penalty; to provide for application; to provide a retroactive effective date; to provide a contingent effective date; to provide an effective date; and to declare an emergency.

The length or difficulty in reading the title does not alone tell us whether more than one subject is expressed. But the length and variety of covered topics necessarily informs us whether the title or the bill embraces more than one subject.

[¶27] Inspection of other legislation during the same session included S.B. 2164 and H.B. 1321. Those were stand-alone bills directly addressing the NDPERS Board related topics in this proceeding. The title of S.B. 2164 was, "A BILL for an Act to amend and reenact section 54-52-03 of the North Dakota Century Code, relating to retirement board membership; to provide an effective date; and to declare an emergency." That single subject legislation was

defeated by the Senate on April 24, 2023. The original title of H.B. 1321 was, "A BILL for an Act to create and enact section 54-52.1-05.2 of the North Dakota Century Code, relating to public employees retirement system contracts for health benefits coverage; and to amend and reenact sections 54-52-03, 54-52.1-04, and 54-52.1-05 of the North Dakota Century Code, relating to retirement board membership and public employees retirement system contracts for health benefits coverage." That bill was defeated by the Senate on March 28, 2023.

3

[¶28] The Legislative Assembly argues we should construe the title liberally as expressing the subject of "state government operations." Doing so would eviscerate our single subject rule. The topic of state government operations is a subject of "excessive generality" that "would violate the purpose and intent of the single subject rule." *Harbor*, 742 P.2d at 1303. Nor are we even convinced a liberal reading of the title describes that impermissibly broad topic. After reading the bill's title, we conclude it does not fairly apprise a reader of anything other than the fact it is a general appropriations bill that also deals with an assortment of unrelated laws. Contrary to assertions by the Legislative Assembly, the title of S.B. 2015 as passed begins by stating it is an act to "provide an appropriation for defraying the expenses" of various state government branches, divisions, departments, and agencies. The title explains the bill includes a series of appropriations to the governor, the legislative assembly, the judicial branch, and several executive agencies. It then lists a long series of statutory amendments by reference to the North Dakota Century Code sections amended. The title also covers "loans from the coal development trust fund, evidence of indebtedness, distribution of illegal drugs, legacy fund earnings, the flexible transportation fund, the capitol grounds planning commission spending limit, the state leave sharing program, capitol grounds rent collections, the retirement board, the public employees retirement system retirement plan, the public employees retirement system plan for state peace officers, the clean sustainable energy authority duties, and joint water resource boards."

15

[¶29] Like its title, the body of S.B. 2015 embraces multiple distinct subjects extraneous and not germane to even the impermissibly broad topic of "state government operations." Senate Bill 2015 contains some provisions that might broadly be described as relating to "state government operations." It appropriates funds and also contains provisions concerning, for example, baseline school funding and aid. One provision deals with projects under the flexible transportation fund and another concerns projects undertaken by the Capitol Grounds Planning Commission. The connection to "state government operations" of other provisions ranges from attenuated to nonexistent. The bill appropriates $1,792,450 for "Prairie public broadcasting grants." It also contains a section to create a "fertilizer development incentive program," and it provides requirements for a fertilizer production facility, including ownership of the facility, its development, and specifically that operations in the facility must be by "hydrogen produced by the electrolysis of water." S.B. 2015, § 51. Another provides "a rural senior center infrastructure grant to an organization in Wells County located in a city with a population between 1,500 and 1,800 according to the 2020 census." *Id.* at § 18. Section 26 relates to coal development trust fund loans. Section 65 requires a legislative study of "the state's guardianship programs." Another section with no conceivable relation to "state government operations" amends the Uniform Controlled Substances Act, N.D.C.C. ch. 19-03.1, by changing language relating to delivery of controlled substances resulting in death. S.B. 2015, § 29.

[¶30] Other jurisdictions have struck down substantive legislation attached to general appropriations bills as violating constitutional one-subject provisions. In *South Dakota Education Association*, the South Dakota Supreme Court struck down legislation included in an appropriations bill that attempted to change educators' collective bargaining rights. 582 N.W.2d at 393. The court reasoned bargaining rights do not "relate directly" to the subject of appropriations or "have a natural connection to that subject." *Id.* In *Planned Parenthood of St. Louis Region v. Department of Social Services*, the Missouri Supreme Court invalidated a provision in an appropriations bill that prohibited the expenditure of funds on abortion facilities. 602 S.W.3d 201, 211 (Mo. 2020). The court explained "any bill that purports to combine

16

appropriations with the enactment or amendment of general or substantive law necessarily contains more than one subject" in violation of Missouri's constitutional single subject provision. *Id.* at 207. The Washington Supreme Court struck down "a law which could not pass on its own merit" that was "slipped" into an appropriations bill. *Flanders v. Morris*, 558 P.2d 769, 772 (Wash. 1977). That court explained: "It is obvious why a legislator would hesitate to hold up the funding of the entire state government in order to prevent the enactment of a certain provision, even though he would have voted against it if it had been presented as independent legislation." *Id.*

[¶31] Senate Bill 2015 was introduced by the Appropriations Committee and originally contained only provisions directly related to the Office of Management and Budget. After amendments by each legislative body, a conference committee suggested additional amendments to the bill by adding various provisions, including section 41 dealing with the NDPERS board. The NDPERS related amendments were essentially the provisions that failed to pass as standalone legislation. *See* H.B. 1321 and S.B. 2164, 68th Leg. Assembly (N.D. 2023). During the Senate floor debate on final adoption of S.B. 2015, one legislator lamented the resurrection of the NDPERS Board bills as part of the OMB bill. He said the combined bill went against everything he believed relating to separation of powers, and that the final bill was "a large mistake." Statement of Senator Dever, Senate Floor Session on S.B. 2015, 68th Leg. Assembly, April 29, 2023.

4

[¶32] We hold both the title and substance of S.B. 2015 violate N.D. Const. art. IV, § 13. The title of S.B. 2015 does not contain language suggesting it is anything other than an appropriations bill with other miscellaneous provisions. The title of S.B. 2015 violates N.D. Const. art. IV, § 13 because it expressed more than one subject. As to the bill's substance, S.B. 2015, § 41 amends a law concerning the number of individuals who may sit on the NDPERS Board, their qualifications, and how they are appointed. Section 41 does not relate to the many other provisions in the bill. The process for appointing members to the NDPERS Board and the Board's specific

composition is not germane to appropriating funds for state government operations. Like its title, the body of S.B. 2015 embraces more than one subject in contravention of N.D. Const. art. IV, § 13. This legislation was originally an appropriations bill. The non-appropriations additions later added to the bill by the House may well violate our constitutional mandate that "no bill may be amended on its passage through either house a manner which changes its general subject matter." *See* N.D. Const. art. IV, § 13. That potential violation aside, the non-germane changes made by both legislative bodies require the conclusion S.B. 2015 is unconstitutional.

IV

[¶33] Because S.B. 2015 was adopted in violation of N.D. Const. art. IV, § 13, we must consider the effect of the violation.

[¶34] Article IV, § 13 provides: "No bill may embrace more than one subject, which must be expressed in its title; but a law violating this provision is invalid only to the extent the subject is not so expressed." *See also Fitzmaurice v. Willis*, 127 N.W. 95, 98 (N.D. 1910) (invaliding a portion of a bill under the single subject clause and leaving the remainder "still in force and effect").

[¶35] In this case, the title and the substance of the bill's body match. Both embrace more than one subject. Therefore, N.D. Const. art. IV, § 13, does not apply to limit invalidity "only to the extent the subject is not so expressed." Rather, S.B. 2015 represents the clearest violation of the single subject rule because the act embraces multiple subjects, all of which are expressed in the title. In such a situation, "the whole act is void." J.G. Sutherland, *Statutory Construction* 121 (1891). When legislation includes multiple subjects in both the body and the title, the whole act is invalid because its formation was contrary to the constitutional single subject prohibition.

[¶36] Even if this Court was inclined to attempt to determine what legislation would have resulted without the violation of the constitutional single subject limitation, our mere attempt would inject the Court into the legislature's domain. Cooley's Treatise emphatically stated: "All the cases recognize this

18

doctrine." Thomas M. Cooley, *Constitutional Limitations* 177 n.2 (6th ed. 1890). The reason derives from the distinct role of the court: "if the title to the act actually indicates, and the act itself actually embraces, two distinct objects, when the constitution says it shall embrace but one, the whole act must be treated as void, from the manifest impossibility in the court choosing between the two, and holding the act valid as to the one and void as to the other. *Id.* (citing *City of Antonio v. Gould*, 34 Tex. 49 (1870); *State v. McCracken*, 42 Tex. 383 (1874)).

[¶37] Article IV, § 13, N.D. Const., limits the Legislative Assembly's power to craft legislation. The provision also directs this Court's disposition when a violation of the section occurs. *Standish*, 57 N.W. at 86 ("This court should be careful to destroy no legislation sanctioned by the lawmaking branch of the state government unless such legislation be a clear violation of the constitutional requirement. But we have no duty higher or more sacred than is the duty to preserve in all its integrity every provision in the fundamental law of the state."). Declaring all of S.B. 2015 invalid is necessary because creation of the act violated a requirement imposed by the Constitution. It is the Court's duty to uphold the clear requirements of the Constitution when they are violated, whether inadvertently or not. As discussed above and below, this is in accord with our decisions since 1889, and with decisions of other jurisdictions applying a single subject rule to legislation similar to S.B. 2015.

[¶38] In *Arizona School Boards Association v. State*, the Association challenged a bill entitled "An Act Amending [Statutes Listed by Number]; Appropriating Monies; Relating to State Budget Procedures." 501 P.3d 731, 735 (Ariz. 2022). The act included sections relating to election procedures, COVID-19 mitigation, dog racing permits, the definition of a "newspaper," and investigation of social media platforms. *Id.* The Arizona single subject rule[1] has been interpreted to prevent "log-rolling" and is "read liberally so as not to

---

[1] "Every act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title; but if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be embraced in the title." Ariz. Const. art. IV, pt. 2, § 13.

impede or embarrass the legislature but not so 'foolishly liberal' as to render the constitutional requirements nugatory." *Id*. at 739. "[C]ompliance with the rule requires that all matters treated should fall under some one general idea, be so connected with or related to each other, either logically or in popular understanding, as to be parts of, or germane to, one general subject." *Id*. (cleaned up). The State argued the bill's various topics were all within a broad conception of the title's reference to "budget procedures." *Id*. at 740. The court concluded the bill's various sections did not fall under "one general idea" and were not germane to one general subject. *Id*. "An act that violates the single subject rule is entirely void because no mechanism is available for courts to discern the primary subject of the act." *Id*.

[¶39] In the course of upholding a capital projects bill against a single subject challenge, the Illinois Supreme Court explained why a single subject challenge is directed toward the legislation as a whole: "It is generally held that when an act contains two or more subjects in violation of the single subject rule, the reviewing court cannot choose which subject is the 'right' one and eliminate the other. Such a determination would 'inject[] the courts more deeply than they should be into the legislative process.'" *Wirtz v. Quinn*, 953 N.E.2d 899, 920 (Ill. 2011) (quoting *Litchfield Elementary Sch. Dist. No. 79 v. Babbitt*, 608 P.2d 792, 804 (Ariz. Ct. App. 1980)). The court in *Wirtz* concluded no violation of the single subject rule occurred because all provisions of the challenged legislation related to capital projects and financing for those projects. *Id*. at 913. The court distinguished three recent decisions where it nullified entire bills for violating the single subject rule. In the first case, the challenged legislation amended three criminal statutes, several tax acts, a forest preserve act, a charitable gaming act, and a communicable disease prevention act. *Id*. at 909. The court rejected the State's argument that the single subject of that legislation was "governmental regulation" or "revenue," reasoning the strained connection between the bill and those broad categories would "render the single subject clause a nullity." *Id*. (quoting *Olender*, 854 N.E.2d at 604). The court distinguished a second case where it rejected the State's argument that the single subject of "governmental matters" encompassed a bill containing "at least two unrelated subjects" of criminal justice and hospital liens. *Wirtz,* at

20

909 (quoting *People v. Reedy*, 708 N.E.2d 1114, 1118 (Ill. 1999)). The court distinguished a third case where it declared unconstitutional a 200-page bill "encompassing such diverse topics as child sex offenders, employer eavesdropping, and environmental impact fees imposed on the sale of fuel." *Wirtz,* at 909. In that case, the court again rejected the State's assertion that the broad subject of the bill was "public safety," concluding that permitting reliance on "a tortured connection to a vague notion of public safety" would "eliminat[e] the single subject rule as a meaningful constitutional check." *Id.* (quoting *Johnson v. Edgar*, 680 N.E.2d 1372, 1381 (Ill. 1997)); *see also Cottrell v. Faubus*, 347 S.W.2d 52, 54 (Ark. 1961) (declaring unconstitutional in its entirety an act containing "more than a score of distinct appropriations for miscellaneous and disconnected subjects").

[¶40] In *LS Power Midcontinent, LLC v. State*, 988 N.W.2d 316, 325 (Iowa 2023), the court considered a single subject[2] challenge to the final appropriations bill of the 2020 session. The issue before the court was the likelihood of success on the merits of the single subject challenge for purposes of a temporary injunction. *Id.* at 334. In analyzing the likelihood of success on the single subject challenge, the court noted the provision "primarily prevents logrolling" and explained:

> "We are skeptical that any single subject could encompass the breathtaking sweep of matters included in H.F. 2643. The title itself gives us pause on single-subject grounds: 'An Act relating to state and local finances by making appropriations, providing for legal and regulatory responsibilities, providing for other properly related matters, and including effective date and retroactive applicability provisions.'
> "LSP argues the subjects are so unrelated the only way to fit them within a single, common subject is to assert they are all 'laws.' It observes the bill contained a medley of appropriations

[2] "Every act shall embrace but one subject, and matters properly connected therewith; which subject shall be expressed in the title. But if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be expressed in the title." Iowa Const., art. III, § 29.

21

provisions . . . corrective provisions . . . and grants of substantive rights . . . ."

*Id.* at 336. The court granted a temporary injunction staying enforcement of the provision of the act challenged by LS Power Midcontinent.

[¶41] In reaching the conclusion that all of S.B. 2015 must be invalidated, we are mindful of some decisions by other state courts that have not invalidated an entire bill following a conclusion there was a single subject violation. The Oklahoma Supreme Court has more than once issued prospective-only decisions. *See Fent v. State ex rel. Office of State Fin.*, 184 P.3d 467, 477 (Okla. 2008) (prospective only); *Campbell v. White*, 856 P.2d 255, 260 (Okla. 1993) (prospective ruling only).

[¶42] The Iowa Supreme Court holds a single subject rule violation "generally requires that an act incorporating more than one subject must be wholly invalidated," but explains the "rule is inapplicable where one of the subjects of the act is its main focus, while another is only secondary." *W. Int'l v. Kirkpatrick*, 396 N.W.2d 359, 366 (Iowa 1986). "When we can ascertain which of the two provisions the legislature would have enacted, we can uphold the legislative intent by striking only the secondary subject." *Id.* (concluding only four sections of a bill not related to "the focus of the Act" were invalid under the single subject rule); *see also S.D. Educ. Assoc.*, 582 N.W.2d at 394 (severing only the challenged provision after determining "the Legislature would have intended the appropriation for salary increases for Regents' employees to take effect even without the unconstitutional clause in section 31 on collective bargaining").

[¶43] The Pennsylvania Supreme Court has declared legislation invalid due to a single subject rule violation, but ordered a delayed effective date for its decision:

> "[O]ur Court must examine the various subjects contained within a legislative enactment and determine whether they have a nexus to a common purpose. Stated another way, our task is to ascertain

whether the various components of the enactment are part of 'a unifying scheme to accomplish a single purpose.'

. . . .

"[U]pon considered reflection, we cannot discern any other common nexus for the myriad disparate provisions of Act 152, inasmuch as we can see no reasonable basis under which deficiency judgment procedures, asbestos statutes of limitations, county police jurisdiction, and sexual offender registration requirements act together as 'a unifying scheme to accomplish a single purpose.'

. . . .

"However, since we find merit in the General Assembly's suggestion that our decision abrogating the entirety of Act 152 will have a significant impact on a wide variety of individuals and entities which have ordered their affairs in reliance on its provisions, we will stay our decision, as we have done under similar circumstances, in order to provide a reasonable amount of time for the General Assembly to consider appropriate remedial measures, or to allow for a smooth transition period."

*Commonwealth v. Neiman*, 84 A.3d 603, 612-13, 616 (Pa. 2013).

[¶44] Invalidation of S.B. 2015 as a whole is required here because we do not know which provisions were primary and which were secondary, or whether the bill would have been enacted absent the presence of any of the many sections. Therefore, we cannot follow the Iowa Supreme Court's path in *Western International*, 396 N.W.2d at 366. While procedural steps may be available for use by a party to delay the effective date of our ruling, *see* N.D.R.App.P. 41(d) (staying the mandate), we have not been asked by a party to forestall the impact of our decision, as was done by the Pennsylvania Supreme Court in *Neiman*, 84 A.3d at 616. Rather, like Iowa's "general rule," and like the results in Arizona and the three Illinois cases discussed above, this Court's duty is to pass on the constitutional question of S.B. 2015's validity

23

without intrusion on the legislative process beyond determining its constitutionality.

V

[¶45] We conclude S.B. 2015 violates N.D. Const. art. IV, § 13 and is void. The Board's petition seeking declaratory relief and a writ of injunction prohibiting execution or enforcement of S.B. 2015 is granted. The Board's motion to supplement the record is denied. Because the constitutional "single subject" rule is dispositive, it is unnecessary to address the Board's remaining claims.

[¶46] Daniel J. Crothers
      Jerod E. Tufte


**Jensen, Chief Justice, concurring specially.**

[¶47] I concur in the majority opinion concluding the legislation was enacted in violation of the single subject rule of article IV, § 13 of the North Dakota Constitution. The majority reaches this conclusion without reaching an opinion on whether the legislation, but for being enacted in violation of the single subject rule, would otherwise have been a permissible action of the legislature. Because I believe the action would otherwise have been permissible, the invalidation of the legislation has far-reaching consequences, and in light of our prior expressed deference to legislative action, I write separately to express my opinion that our judgment in this case should be stayed for a period of thirty days. Ordinarily, a mandate must be issued twenty-one days after the entry of judgment, which is issued simultaneously with this Court's opinion. N.D.R.App.P. 41(b). Rule 41(b) provides this Court with discretion to stay its mandate following the issuance of an opinion. A stay of thirty days would allow the legislature an opportunity to call a special session and enact all of the effected legislation in a manner consistent with the single subject rule of article IV, § 13 of the Constitution.

[¶48] The Board of Trustees of the North Dakota Public Employees Retirement System ("Board") petitions this Court seeking declaratory relief and a writ of

injunction, challenging N.D.C.C. § 54-52-03 and section 41 of S.B. 2015 (2023), enacted by the 68th Legislative Assembly, both of which provide for the appointment of sitting legislators to the Board. The Board asserts legislators holding office on the Board violates article IV, § 6 of the North Dakota Constitution; violates the separation of powers between coequal branches of government and encroaches upon the powers of the executive branch in violation of articles IV, V, and XI of the Constitution; violates the common-law rule against incompatibility of office; and violates the single subject rule of article IV, § 13 of the Constitution. As noted above, the majority concludes the legislation violates article IV, § 13 of the Constitution, but does not exercise its authority to stay the mandate pursuant to N.D.R.App.P. 41(b).

[¶49] The majority opinion has ramifications far beyond the issue raised by the Board, and invalidates all of the legislation included within S.B. 2015 (2023). The legislation includes appropriations to several branches, agencies, and offices including the office of management and budget, the office of the governor, legislative assembly, adjutant general, legislative council, department of environmental quality, department of labor and human rights, department of public instruction, department of commerce, department of health and human services, department of career and technical education, and the judicial branch. The legislation also creates and enacts new laws, and reenacts existing laws—most of which pertain to state government operations.

[¶50] If we reached the substantive arguments of the Board, I would conclude N.D.C.C. § 54-52-03 and section 41 of S.B. 2015, which provide for the appointment of four sitting legislators to the Board, do not violate article IV, § 6 of the North Dakota Constitution; articles IV, V, and XI of the Constitution, the common-law rule against incompatibility of office, or the separation of powers doctrine. Because of the far-reaching impact of invalidating the entire bill, and the likelihood the legislation would survive the other challenges raised by NDPERS (assuming each individual subject commands a majority), I would stay the mandate in this case for a period of thirty days pursuant to N.D.R.App.P. 41(b).

I

[¶51] On June 1, 2023, the Board petitioned this Court to exercise its original jurisdiction under N.D.C.C. § 27-02-04, seeking declaratory relief under N.D.C.C. § 32-23-01 and a writ of injunction under N.D.C.C. § 32-06-01. The Board filed a motion for a preliminary injunction before the hearing, which this Court denied.

[¶52] Specifically, the Board seeks a declaration that section 41 of S.B. 2015 is void ab initio and N.D.C.C. § 54-52-03 is invalid, both of which provide for appointment of sitting legislators to the Board, because they violate article IV, § 6 of the North Dakota Constitution, the separation of powers under articles IV, V, and XI of the Constitution, and the common-law doctrine of incompatibility. The Board also seeks a declaration that S.B. 2015 is invalid because the joinder of an appropriation bill with an amendment to the Board's structure is not germane, constitutes "logrolling," and is in violation of article IV, § 13 of the Constitution.

[¶53] The Board requests a writ of injunction preventing the appointment of additional legislators and the continued service of sitting legislators on the Board. The Board argues irreparable harm results when legislators—who have a duty to their constituents and the state at large—must also hold a fiduciary duty to advance the interests of PERS members and beneficiaries. The Board argues these dual duties are inherently contradictory.

[¶54] Section 54-52-03, N.D.C.C., after the recent amendments, provides:

> 1. A state agency is hereby created to constitute the governing authority of the system to consist of a board of *eleven* individuals known as the retirement board. No more than one elected member of the board may be in the employ of a single department, institution, or agency of the state or in the employ of a political subdivision. An employee of the public employees retirement system or the state retirement and investment office may not serve on the board.

2. *Four members of the legislative assembly* must be appointed to serve on the board. The majority leader of the house of representatives shall appoint *two members of the house of representatives* and the majority leader of the senate shall appoint *two members of the senate*. The members appointed under this subsection shall serve a term of two years.

3. Four members of the board must be appointed by the governor to serve a term of five years. Each appointee under this subsection must be a North Dakota citizen who is not a state or political subdivision employee and who is familiar with retirement and employee benefit plans. The governor shall appoint one citizen member to serve as chairman of the board.

4. Three board members must be elected by and from among the active participating members, members of the retirement plan established under chapter 54-52.6, members of the retirement plan established under chapter 39-03.1, and members of the job service North Dakota retirement plan. Employees who have terminated their employment for whatever reason are not eligible to serve as elected members of the board under this subsection. Board members must be elected to a five-year term pursuant to an election called by the board. Notice of board elections must be given to all active participating members. The time spent in performing duties as a board member may not be charged against any employee's accumulated annual or any other type of leave.

5. The members of the board are entitled to receive one hundred forty-eight dollars per day compensation and necessary mileage and travel expenses as provided in sections 44-08-04 and 54-06-09. This is in addition to any other pay or allowance due the chairman or a member, plus an allowance for expenses they may incur through service on the board.

6. A board member shall serve until the board member's successor qualifies. Each board member is entitled to one vote, and *six of the eleven* board members constitute a quorum. Six votes are necessary for resolution or action by the board at any meeting.

(Emphasis added.) Section 41 of S.B. 2015 amended N.D.C.C. § 54-52-03, increasing the number of Board members from nine to eleven and changing the number of appointed legislators from two legislators to four legislators. *See* N.D.C.C. § 54-52-03(1), (2), and (6); 2023 N.D. Sess. Laws ch. 47, § 41.

## II

[¶55] The Board argues legislators holding the office of Board member violates article IV, § 6 of the North Dakota Constitution. This section provides:

> While serving in the legislative assembly, no member may hold any *full-time appointive state office* established by this constitution or designated by law. During the term for which elected, no member of the legislative assembly may be appointed to any *full-time office* that has been created by the legislative assembly. During the term for which elected, no member of the legislative assembly may be appointed to any *full-time office* for which the legislative assembly has increased the compensation in an amount greater than the general rate of increase provided to full-time state employees.

N.D. Const. art. IV, § 6 (emphasis added). The Board argues its members are appointed state officers and their position meets the definition for "full-time." The Legislative Assembly asserts members are compensated on a per diem basis, serve only once per month, and during the last fiscal year, were reimbursed by the State only 12 times. The Legislative Assembly also asserts the meaning of "full-time" is approximately 40 hours of work per week on a sustained basis.

[¶56] This Court uses the following framework when interpreting constitutional provisions:

> In interpreting constitutional provisions, we apply general principles of statutory construction. Our overriding objective is to give effect to the intent and purpose of the people adopting the constitutional provision. The intent and purpose of constitutional provisions are to be determined, if possible, from the language itself. In construing constitutional provisions, we ascribe to the

28

words the meaning the framers understood the provisions to have when adopted.

*Wrigley v. Romanick*, 2023 ND 50, ¶ 17, 988 N.W.2d 231 (cleaned up). Constitutional provisions are generally given their plain, ordinary, and commonly understood meaning. *Thompson v. Jaeger*, 2010 ND 174, ¶ 7, 788 N.W.2d 586. The North Dakota Constitution must also be read in the light of history. *Wrigley*, at ¶ 17.

[¶57] In 1984, the people of North Dakota amended the provision at issue, presently found at N.D. Const. art. IV, § 6, replacing and revising a provision that had used the phrase "[n]o member . . . [shall] be appointed or elected to any *civil office*," with the phrase "no member may hold any *full-time appointive state office*[.]" *Compare* N.D. Const. art. IV, § 17 (1981), *with* 1984 amendments to N.D. Const. art. IV (H.C.R. 3028, 1985 N.D. Sess. Laws ch. 706, § 6) (emphasis added). In 2012, article IV, § 6 was again amended to add, "During the term for which elected, no member of the legislative assembly may be appointed to any *full-time* office for which the legislative assembly has increased the compensation in an amount greater than the general rate of increase provided to full-time state employees." *See* H.C.R. 3047, 2013 N.D. Sess. Laws ch. 515, § 1 (emphasis added).

[¶58] This Court interpreted the phrase "civil office" in *Baird v. Lefor*, 201 N.W. 997, 999 (N.D. 1924). In *Baird*, this Court held that a state senator was allowed to hold the title of receiver during judicial liquidation proceedings because in the senator's role as a court-appointed receiver, he exercised "none of the powers of civil government." *Id*. That phrase is juxtaposed against the newer phrase in N.D. Const. art. IV, § 6, "full-time appointive state office[,]" and when compared means the new phrase prohibits the exercising of "full-time" powers of civil government. The new phrase permits legislators to hold *non-full-time* offices that exercise some *limited* powers of civil government. A plain reading of the phrase provides for this interpretation as does the historical context of the change. *See State v. Hagerty*, 1998 ND 122, ¶ 17, 580 N.W.2d 139 (when interpreting constitutional amendments, this Court "look[s] first to the historical context" including "what it displaced").

[¶59] The compensation scheme provided in N.D.C.C. § 54-52-03(5) also gives context to the meaning of "full-time." It provides that Board members are paid on a per diem basis. This coupled with evidence that Board members sought reimbursement only 12 times in 2022, and that Board meetings occur only once per month supports a finding that legislators serving as members on the Board are not "full-time." An ordinary and common understanding of the term "full-time" requires more than per diem compensation and a once-monthly time commitment. The Board argues its members serve on a regular and continuing basis as managing fiduciaries of NDPERS. I determine this argument unpersuasive because article IV, § 6 of the North Dakota Constitution does not prohibit service of legislators to appointive state offices who serve regularly or continuously, but rather prohibits service in appointive state offices that are "full-time." If we were to reach this issue, I would conclude legislative membership on the Board is not a "full-time appointive state office" and a legislator may be appointed to the Board without violating article IV, § 6.

III

[¶60] The Board argues a statute permitting a legislator to simultaneously hold the office of Board member violates the tenets of separation of powers between coequal branches of government, and unlawfully encroaches upon the duties and powers of an executive branch agency in violation of articles IV, V, and XI of the North Dakota Constitution. The Legislative Assembly responds that neither N.D.C.C. § 54-52-03 nor section 41 of S.B. 2015 violates separation of powers under the state constitution because the appointment power resides in the legislature unless expressly assigned elsewhere, because legislators assigned to the Board constitute a minority in voting power, cannot direct or halt actions unsupported by other Board members, and because the legislature's intent was not one of usurpation, but rather cooperation.

A

[¶61] I first address the Board's challenge that the state constitution prohibits legislators from appointing themselves to executive boards. In article V, § 8 of the North Dakota Constitution, the Governor is given appointment power for

30

state offices "if no other method is provided by this constitution or by law." While the Governor is given authority to appoint executive offices, N.D.C.C. § 54-52-03 and S.B. 2015 are "other" methods provided by law, and as such, do not violate article V of the Constitution.

[¶62] This Court has also previously addressed this issue and found appointment powers are vested in the legislative branch. *See State v. Frazier*, 182 N.W. 545, 548 (N.D. 1921). In the *Frazier* decision, this Court stated:

> This court has heretofore held, in construction of constitutional powers, that the power of appointment to office (and this includes power of removal) is vested neither in the executive nor judicial department of the government, excepting as the Constitution has expressly granted such power; that this power resides in the Legislature; that all governmental sovereign power is vested in the Legislature, except such as granted to other departments of the government, or expressly withheld from the Legislature by constitutional restrictions.

*Id.* Had we reached this issue, I would conclude the legislature's authority to appoint members to an executive agency falls within the powers vested to it by the state constitution. I would reject the Board's assertion that N.D.C.C. § 54-52-03 and S.B. 2015 violate article V of the North Dakota Constitution.

B

[¶63] The Board further asserts that N.D.C.C. § 54-52-03 and section 41 of S.B. 2015 violate the separation of powers between coequal branches of government as established by article XI, § 26 of the North Dakota Constitution. States maintain the authority to decide the extent to which powers will be kept separate:

> The separation-of-powers doctrine which is embodied in the United States Constitution is not mandatory in state governments and is not enforceable against the states as a matter of constitutional law. It is for the State to determine whether and to what extent its powers will be kept separate between the three branches of government or whether persons belonging to one

department may exert powers which, strictly speaking, pertain to another department of government. A state's determination one way or the other cannot be an element in the inquiry whether due process of law has been respected by the state or its representatives.

16 C.J.S. *Constitutional Law* § 276 (May 2023 Update) (footnotes omitted). Moreover, the doctrine allows for some degree of functional overlap between the branches. *See* 16A Am. Jur. 2d *Constitutional Law* § 242 (May 2023 Update) ("[O]ne branch of government may engage in functions that intervene in or overlap with the functions of another branch so long as it does not undermine the operation of that other branch or undermine the rule of law that all branches are committed to maintain." (footnote omitted)).

[¶64] This Court has made similar conclusions regarding our three branches of government:

> The essential structural division of power into three branches created by our Constitution parallels that of our sister states and also that of the U.S. Constitution. Accordingly, we may find the decisions from the U.S. Supreme Court and the highest courts of our sister states persuasive, but ultimately we are charged with interpreting the North Dakota Constitution and its distinct provisions. We have sometimes navigated our own path in defining the contours of separation of powers[.]

*N.D. Legis. Assembly v. Burgum*, 2018 ND 189, ¶ 42, 916 N.W.2d 83. We have also explained that "[u]nder our constitutional system, the Legislature may not delegate to itself, or to a subset of its members, executive or judicial functions." *Id.* at ¶ 59 (quoting *Kelsh v. Jaeger*, 2002 ND 53, ¶ 21, 641 N.W.2d 100); *see also* N.D. Const. art. XI, § 26 ("The legislative, executive, and judicial branches are coequal branches of government."). *See also State v. Hanson*, 558 N.W.2d 611, 614 (N.D. 1996) (finding article XI, § 26 of the North Dakota Constitution formalizes a separation of powers).

[¶65] We have not adopted a bright-line analysis for what degree of overlap between the branches is tenable before concluding one branch has undermined

the rule of another. We have considered approaches taken by sister states in navigating our own rule of law in this area. In *Burgum*, this Court relied on *State ex rel. McLeod v. McInnis*, 295 S.E.2d 633, 637 (S.C. 1982), a South Carolina case, as persuasive authority, when it determined the legislative assembly usurped the executive branch's power by retaining for itself budget approval requirements for funds spent by the water commission. 2018 ND 189, ¶¶ 55, 60. *McInnis* also provides relevant assistance for determining legislative encroachment when it found the "separation of powers doctrine does not in all cases prevent individual members of the legislature from serving on administrative boards or commissions . . . where such services falls in the realm of cooperation . . . and there is no attempt to usurp functions of the executive department[.]" 295 S.E.2d at 636.

[¶66] Another South Carolina case established a bright-line test for analyzing the issue by holding that legislative appointment to executive boards do not violate the separation of powers doctrine where, "(1) the legislators [are] a numerical minority, and (2) the body [] represent(s) a cooperative effort to make available to the executive department the special knowledge and expertise of designated legislators[.]" *S.C. Pub. Int. Found. v. S.C. Transp. Infrastructure Bank*, 744 S.E.2d 521, 527 (S.C. 2013) (quoting *Tall Tower, Inc. v. S.C. Procurement Rev. Panel*, 363 S.E.2d 683, 685-86 (S.C. 1987)).

[¶67] I conclude most persuasive a test from Oklahoma, enumerated in *In re Oklahoma Department of Transportation*, 64 P.3d 546, 550 (Okla. 2002), that establishes a framework for determining whether members from a legislature serving on an administrative board or commission is a usurpation of power of the executive branch. The court determined that "[r]ather than focusing exclusively on how a function might be conceptually classified . . . a usurpation occurs when one department is . . . subjected directly or indirectly to the coercive influences of another, and when there is a significant interference by one department with the operations of another department." *Id.* (cleaned up). The court went on to discuss a non-exclusive set of four criteria in deciding separation of powers issues. The court considered the following: (1) the "essential nature of the power being exercised. Is the power exclusively

33

executive or legislative or is it a blend of the two?" (2) the "degree of control" the legislature was attempting to exercise; "Is the influence coercive or cooperative?" (3) the legislature's objective or intent either to "cooperate with the executive by furnishing some special expertise of one or more of its members" or to establish "its superiority over the executive department in an area essentially executive in nature"; and (4) the "practical result of the blending of powers as shown by actual experience over a period of time where such evidence is available." *Id.* (quoting *State ex rel. Schneider v. Bennett*, 547 P.2d 786, 792 (Kan. 1976)). I would adopt this test and apply the four criteria to the instant case.

1

[¶68] In examining the first factor—whether the nature of the power being exercised is executive or legislative, or a blend of the two—it is important to note the Board "constitute[s] the governing authority of the system[.]" N.D.C.C. § 54-52-03(1). The Board is responsible for managing the NDPERS system, has all the privileges of a corporation, appoints an executive director, and creates staff positions necessary for the "sound and economical administration of the system." N.D.C.C. § 54-52-04(1)-(3). The Board must also arrange for an actuarial expert to "make an annual valuation of the liabilities and reserves of the system" and determine "the contributions required by the system to discharge its liabilities and pay the administrative costs under this chapter, and to recommend to the board rates of employer and employee contributions required, based upon the entry age normal cost method, to maintain the system on an actuarial reserve basis[.]" N.D.C.C. § 54-52-04(4).

[¶69] The nature of the Board's tasks are a blend of legislative and executive. While the Board is responsible for overall management of the system—which is more executive in nature—much of the day-to-day operations are facilitated by hired director(s), staff, and actuarial experts in the field—who make daily decisions on how the system is to be run. I would determine this factor weighs neither in favor of usurpation, nor against usurpation, but is neutral given the dual nature of the Board's authority.

34

[¶70] The second factor considers whether the legislature is attempting to maintain control over executive functions. This factor weighs in favor of the Legislative Assembly's argument that four appointed legislators to the Board do not exercise a coercive degree of control over the executive functions of the agency. The four appointed legislators constitute a minority of the Board; the chairman of the Board is appointed by the Governor; and individual legislators—either together or alone—cannot bring the Board's directives to a halt or initiate actions on their own. While it may be true the legislature appears to have diluted the elected Board members' power, that issue was not raised by the Board. This factor weighs in favor of finding legislative appointments to the Board do not equal a usurpation of the executive branch's power.

[¶71] The third factor considers whether it is the legislature's intent to cooperate with an executive board by providing legislator expertise on a specific area, or instead, to establish superiority over the executive board. The third factor does not weigh in favor of usurpation. Appointing four of eleven Board members from the legislature in no way establishes superiority over the executive board or its functions. Furthermore, the Board has provided no legislative history that suggests it was the legislature's intent to establish superiority over the direction of the Board. The Board asserts that "[t]he motivation is obvious[,]" because Board members are "responsible for adopting the actuarial assumptions and standards necessary to assure proper funding of NDPERS." However, the Board and its composition—both before, and as modified by section 41 of S.B. 2015—will ensure that the four assigned legislators cannot reign supreme over the direction and decisions of the Board. The legislators can merely provide input in cooperation with other Board members. This factor weighs against a determination of usurpation by the legislative branch against the executive branch.

[¶72] The fourth factor considers the practical results of blending power over time. Here, two members of the legislature have previously been appointed to serve on the Board, and under the modification, four members serve in that capacity. The Board, as Petitioner, provides no "practical results" showing the Board was unable to practically fulfill their duties with two legislators appointed to it. An individual breach of fiduciary duty, should it occur, can be addressed with action taken against individual legislators who may be alleged to have breached their fiduciary duty as a member of the Board.

[¶73] I conclude no direct or indirect coercive influences in the appointment of four legislators to the Board, and conclude no significant interference in the operations of the Board or the NDPERS system considering that the composition of the Board does not allow the legislators to exercise coercive control over the Board's action, establish superiority over the Board's direction, or practically alter the Board's functions despite a limited blending of power. These conclusions are in accordance with the test established in *In re Okla. Dep't of Transp.* I would conclude that N.D.C.C. § 54-52-03 and section 41 of S.B. 2015 do not violate the separation-of-powers doctrine found in article XI, § 26 of the North Dakota Constitution.

IV

[¶74] The Board argues that a legislator simultaneously holding the office of NDPERS trustee violates the common-law rule against incompatibility because as a trustee, a Board member's fiduciary responsibility for adopting actuarial assumptions necessary to assure proper funding of NDPERS is "hopelessly in conflict" with a legislator's duty to implement the state budget. The Board asserts a fiduciary must be concerned with the participants' best interest, not the best interest of the state budget or their constituents. Given these fiduciary responsibilities, the Board contends a legislator cannot perform the duties of his or her elected office and also fulfill an undivided duty of loyalty to NDPERS.

[¶75] The Board relies on *Tarpo v. Bowman Public School District #1*, which states, "it is a well settled rule of the common law that a person may not, at one and the same time, rightfully hold two offices which are incompatible." 232 N.W.2d 67, 70 (N.D. 1975) (quoting *State v. Lee*, 50 N.W.2d 124, 126 (N.D. 1951)). This Court has explained "the common law is adopted as the law in this state where there is no express constitutional or statutory law on the subject." *Trosen v. Trosen*, 2022 ND 216, ¶ 21, 982 N.W.2d 527; *see also* N.D.C.C. § 1-01-03(4), (5), and (7); *Reese v. Reese-Young*, 2020 ND 35, ¶ 20, 938 N.W.2d 405. "The common law, which is based on reason and public policy, can best be determined by studying the decisions of our federal and state courts and the writings of past and present students of our country's law over all the years of American judicial history." *Trosen*, at ¶ 21 (quoting *Reese*, at ¶ 21). However, under N.D.C.C. § 1-01-06, "there is no common law in any case in which the law is declared by the code."

[¶76] Section 54-52-03, N.D.C.C., has been declared by the code. The legislator appointments to the NDPERS Board, as provided under N.D.C.C. § 54-52-03 and increased in S.B. 2015, are the product of the legislative process resulting in statutory law passed by the legislature. To the extent the appointments provided by the code—both previously and as amended by S.B. 2015—are in conflict with the common-law rule, the code must prevail. I would conclude the Board's argument regarding the common-law doctrine of incompatibility of office to be without merit.

V

[¶77] The Board argues S.B. 2015 violates the single subject rule, found in article IV, § 13 of the North Dakota Constitution, by embracing more than a single subject because section 41, which amends and reenacts N.D.C.C. § 54-52-03 by changing the NDPERS Board's inherent composition, is not germane to the subject expressed in the title of the bill, which the Board argues is an "appropriation bill." As noted above, I agree with the conclusion in the majority opinion. However, when considering whether to stay our mandate in this case pursuant to N.D.R.App.P. 41(b), I believe our prior caselaw and deference to legislative action compels a stay.

37

[¶78] North Dakota Constitution article IV, § 13 provides that "[n]o bill may embrace more than one subject, which must be expressed in its title; but a law violating this provision is invalid only to the extent the subject is not so expressed." This Court has interpreted the one-subject requirement broadly "as requiring that all matters treated by one piece of legislation be reasonably germane to one general subject or purpose." *SunBehm Gas, Inc. v. Conrad*, 310 N.W.2d 766, 772 (N.D. 1981). "Such an act is not invalidated simply because the title may enumerate a plurality of subjects, when all of these subjects taken together are but one subject." *State ex rel. Sandaker v. Olson*, 260 N.W. 586, 592 (N.D. 1935). Stated another way:

> [T]his rule means that legislation may include any matter naturally and reasonably connected with the subject of the act as expressed in the title. It is also the law of this state that the title to an act will be construed liberally and not in a strict and technical manner.

*Lapland v. Stearns*, 54 N.W.2d 748, 752 (N.D. 1952) (citations omitted); *State v. Colohan*, 286 N.W. 888, 893 (N.D. 1939); *City of Mandan v. Nichols*, 243 N.W. 740, 742-43 (N.D. 1932); *State v. Steen*, 236 N.W. 251, 253-54 (N.D. 1931); *Great N. Ry. Co. v. Duncan*, 176 N.W. 992, 997 (N.D. 1919); *State ex rel. Gaulke v. Turner*, 164 N.W. 924 (N.D. 1917); *Eaton v. Guarantee Co.*, 88 N.W. 1029, 1029-30 (N.D. 1902). "Whether a law is unconstitutional is a question of law, which is fully reviewable on appeal." *City of Fargo v. Roehrich*, 2021 ND 145, ¶ 5, 963 N.W.2d 248. "We construe statutes and municipal ordinances to avoid constitutional infirmities, and we resolve any doubt in favor of the constitutionality of the statute or ordinance." *Id*.

[¶79] We have historically provided great deference to the legislature with regard to the application of the single subject rule. This case goes far beyond our prior deference and the majority opinion rightly concludes the legislation violates the single subject rule. However, in light of my belief the underlying legislation directly at issue in this case would survive the other challenges raised by NDPERS, the far-reaching impact of invalidating the legislation as having been enacted in violation of the single subject rule, and our prior

caselaw reflecting great deference to the legislature, I would exercise our discretion to stay the mandate in this case for thirty days.

VI

[¶80] I concur in the majority opinion the legislation violates the single subject rule as expressed in article IV, § 13 of the North Dakota Constitution. Had we reached the merits of the underlying legislation at issue in this case, I would conclude N.D.C.C. § 54-52-03 and section 41 of S.B. 2015, which provide for the appointment of four sitting legislators to the NDPERS Board, do not violate article IV, § 6; articles IV, V, and XI of the Constitution. Furthermore, I would conclude N.D.C.C. § 54-52-03 and section 41 of S.B. 2015 do not violate the separation of powers between coequal branches of government, and do not violate the common-law rule against incompatibility of office. I would also recognize the far-reaching implication of our decision and our prior deference with regard to the single subject rule and stay the mandate of our decision for a period of thirty days to provide the legislature an opportunity to call a special session and enact all of the impacted legislation in compliance with article IV, § 13 of the Constitution.

[¶81] Jon J. Jensen, C.J.

**McEvers, Justice, concurring specially.**

[¶82] I agree with the majority opinion concluding the legislation enacted is in violation of the single subject rule of article IV, § 13 of the North Dakota Constitution and is unconstitutional and, therefore, not valid. I also agree with that portion of Chief Justice Jensen's concurring opinion that our judgment should not be issued and the mandate in this case should be stayed for a period of time to allow the legislative assembly an opportunity to convene a special session to consider whether all the sections previously approved will continue to gather sufficient support when they are presented and voted on in a constitutional manner.

[¶83] As noted in the Chief Justice's separate, N.D.R.App.P. 41(b) provides this Court with discretion to stay its mandate following the issuance of an opinion. *See also Datz v. Dosch*, 2014 ND 102, ¶ 9, 846 N.W.2d 724 (noting N.D.R.App.P. 41(b) provides the Court with discretion to extend the time to issue the mandate). While granting a stay when no stay has yet been requested is an unusual act by this Court, a stay is within the Court's authority. I agree with the Chief Justice that not granting a stay may have unintended and far-reaching effects. The funding for much of state government is called into question by declaring the legislation invalid—including funds that have already been spent. Nonetheless, I do not care to speculate on the likelihood of which legislation may survive additional consideration by the legislative assembly, so I do not fully join the Chief Justice in his separate.

[¶84] Lisa Fair McEvers
      Gary H. Lee, D.J.

[¶85] The Honorable Gary H. Lee, D.J., sitting in place of Bahr, J., disqualified.

**On Motion for Clarification and Motion for Stay**
**Filed October 12, 2023**
**No. 20230158**

**Per Curiam.**

[¶86] The Legislative Assembly moved "for clarification as to whether, and for what duration, the issuance of the Court's judgment and mandate have been stayed," and further moved for a stay of our decision until December 18, 2023. The Board responded that no clarification is needed, that no stay had been issued, and that N.D.R.App.P. 41 provides no basis for issuing a stay in this matter. We now clarify that we grant no stay of the judgment, we deny the Legislative Assembly's motion for a stay of judgment, and we direct the clerk of the Supreme Court to issue judgment without further delay.

[¶87] Neither the briefs of the parties nor the opinions previously issued by this Court identify authority for this Court to stay its judgment under these circumstances. Justice Crothers' opinion, joined by Justice Tufte, at ¶ 44 left open the possibility that a stay or other procedural delay "may be available" but declined to grant a stay of the decision absent a request. Justice Crothers cited N.D.R.App.P. 41 as supporting that proposition by inference (using a *see* signal) and a citation to a Pennsylvania case reversing a trial court decision and staying the mandate for 90 days before returning jurisdiction to the trial court. *Commonwealth v. Neiman*, 624 Pa. 53, 75, 84 A.3d 603, 616 (2013) (citing *City of Philadelphia v. Com.*, 575 Pa. 542, 587, 838 A.2d 566, 594 (2003)). Chief Justice Jensen, at ¶ 47, cited only N.D.R.App.P. 41 for the proposition that the Court has authority to stay a decision and, at ¶ 50, stated that he "would stay the mandate in this case for a period of thirty days." *See also* ¶¶ 77, 79, 80. Justice McEvers, at ¶ 83, joined by Judge Lee, also relied solely on Rule 41 as providing authority to grant a stay. A majority of the Court thus granted a stay until October 28. On motion and full briefing by the parties, the Court has reconsidered the applicability of Rule 41 and now rescinds the previously granted stay.

[¶88] Rule 41 does not apply here because this is a case arising under our original jurisdiction. In an original jurisdiction proceeding, we do not issue a

mandate returning jurisdiction to the district court because the matter did not originate there. *Disciplinary Board v. Larson*, 485 N.W.2d 345, 348 n.2 (N.D. 1992) (explaining "[a] mandate is the official mode of communicating the judgment of an appellate court to a lower court" and therefore Rule 41 does not apply). No other rule even suggests we have discretion to delay the effect of a decision after issuance of an opinion. *See* N.D.R.App.P. 36 ("The clerk of the supreme court must prepare, sign and enter the judgment: (1) after receiving the court's opinion."). Section 27-02-05, N.D.C.C., recognizes the supreme court has "full power and authority to carry into complete execution all its judgments." Neither party argues this statute provides authority to stay a judgment in these circumstances, and it is not clear the power to carry a judgment into complete execution necessarily includes the opposite power—to delay carrying into effect a judgment—especially where that judgment declares a coordinate branch exceeded its constitutional limits and a stay allows that violation to continue. We have declared S.B. 2015 was unconstitutionally enacted and thus void from the beginning. A stay of that declaration would allow the State to proceed as if the legislation had been lawfully enacted for the duration of the stay.

[¶89] Absent statutory authority to grant a stay, a court may have inherent power to grant a stay. The Legislative Assembly relies on authority discussing the inherent power of courts of general jurisdiction to vacate, grant relief from, or temporarily stay execution of judgments. *See Hamilton v. Hamilton*, 410 N.W.2d 508, 515 (N.D. 1987); *Wassung v. Wassung*, 286 N.W. 340, 342 (Neb. 1939). These cases are distinguishable in that this Court is not a court of general jurisdiction and we are not considering a motion to vacate or grant relief from judgment of the type discussed in these cases. Such motions are routinely considered by district courts under N.D.R.Civ.P. 60. A motion to temporarily stay execution of a judgment requiring payment of money, as in *Wassung* and similar cases, is within the trial court's inherent power of supervision over its process. That supervisory power is distinctly different from the motion before us to stay entry of a declaratory judgment. A court's "power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for

42

itself, for counsel, and for litigants." *Landis v. North American Co.*, 299 U.S. 248, 254 (1936). The rationale for that inherent power to stay proceedings is entirely absent when the court has decided a matter and seeks to delay the effective date of a decision that is final and from which no appeal may be taken.

[¶90] A pause to consider the source of authority reveals a more fundamental defect in granting a stay of judgment here. This Court has only the authority granted to it by the people of this state through its constitution. Likewise, the Legislative Assembly has only the authority granted to it by the people of this state through its constitution. We concluded, at ¶ 32, that the Legislative Assembly has exceeded the limits imposed on its authority by the single-subject rule and that the constitutional remedy is that the bill is invalid. *See* ¶ 44.

[¶91] After declaring a constitutional violation, it would be a novel assertion of authority by this Court to countenance a continuation of that violation by delaying the effective date of our judgment. We concluded the Legislative Assembly legislated outside constitutional limits when it enacted S.B. 2015. We have repeatedly said in such circumstances the enactment is *void ab initio*. *Hoff v. Berg*, 1999 ND 115, ¶ 19, 595 N.W.2d 285; *see also Interest of J.B.*, 2021 ND 90, ¶ 4, 959 N.W.2d 869 ("When a court concludes a statute violates the constitution, the remedy the judicial branch may grant is to declare that the 'unconstitutional legislation is void and is to be treated as if it never were enacted.'" (citing *Berg*, at ¶ 19)); *Sorum v. State*, 2020 ND 175, ¶ 21, 947 N.W.2d 382 (same); *see Nw. Landowners Ass'n v. State*, 2022 ND 150, ¶ 12, 978 N.W.2d 679 (same); *State v. Anderson*, 2022 ND 144, ¶ 7, 977 N.W.2d 736 (same). A stay of judgment after issuance of an opinion declaring legislation unconstitutional would be an assertion of power by the Court that it may declare legislation void but deem it to be valid during the pendency of the stay. This Court, itself limited by the constitution, will not claim for itself the power to grant to the Legislative Assembly authority that the Constitution does not give either the Court or the Assembly.

[¶92] The motion for a stay is denied, and the clerk of the Supreme Court is directed to enter judgment without further delay.

[¶93] Jon J. Jensen, C.J
Daniel J. Crothers
Lisa Fair McEvers
Jerod E. Tufte
Gary H. Lee, D.J.

[¶94] The Honorable Gary H. Lee, District Judge, sitting in place of Bahr, J., disqualified.